[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-14602

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 14, 2011
JOHN LEY
CLERK

D. C. Docket No. 05-00269-CR-TWT-11-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PHILLIP E. HILL,
MARCUS ALCINDOR,
a.k.a. Christopher Alcindor,
ROBERT POWERS,
CHRISTINE LAUDERMILL,
DAVID VAN MERSBERGEN,
FRED FARMER,
DAVID THOMAS,
LESLIE RECTOR,
BARBARA BROWN, a.k.a. Barbara Eubanks,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(June 14, 2011)

Before EDMONDSON, CARNES, and ANDERSON, Circuit Judges.

CARNES, Circuit Judge:

When Phillip Hill was a young man growing up the small town of Sumatra, Florida he helped tend his grandfather's beehives. He would, as his lawyer would later tell the jury, "get the honey out of the hives." And he was good at what he did, being named "Florida beekeeper of the year" when he was twenty years old. Three decades later, Hill got involved in the busy hive of Atlanta's high-end residential real estate market. His goal was still to get out as much honey as he could. From 2000 to 2003 Hill and his associates scooped out of the market almost $22 million in illicit gain. They did it by fraudulently obtaining over 300 mortgage-backed loans for buyers who used the loans to purchase Atlanta-area houses and condominiums from Hill and his associates at more than market value. Almost all of those loans, totaling $110 million, went into default causing lenders and guarantors to be stung with over $38 million in losses. Innocent homeowners in neighborhoods that were hit with foreclosures and distorted property values caused by the scheme also felt the pain, and many people who were used as straw buyers suffered ruined credit and a number of them went bankrupt.

Big fraud schemes generally give rise to big prosecutions, and this one is no exception. In this trial alone there were a dozen defendants, and the 187-count indictment against them involved more than 300 transactions. The government's exhibit list, which was 178 pages long, included 1,135 exhibits that filled 8 filing cabinets. The government also presented more than 100 witnesses, either through live testimony or the parties' stipulation about what that testimony would be. The presentation of the evidence took 31 trial days. In the end, all but two of the twelve defendants were convicted of at least some charges, and they were sentenced to terms of imprisonment ranging from 5 months to 28 years.

Big multi-defendant prosecutions generally give rise to big appeals and long opinions. Regrettably, this one is no exception.

## I. Factual Background

### A. The Scheme

Hill or entities he created purchased properties that they sold to straw buyers for substantially more than the cost or value of those properties. The sales were financed with mortgages based on property values that were inflated by various fraudulent representations that Hill orchestrated. The buyers ultimately defaulted on the loans and the mortgages were foreclosed, but by then Hill and his

3

associates had gotten their profits from the sweet deals they had made by selling the properties at inflated prices.

The higher the property value the larger the loan, the larger the loan the higher the sales price, and the higher the sales price the larger the profit. In order to obtain loans for the highest possible property value, and reap the highest possible profit, Hill and his associates made a multitude of misrepresentations to lenders. They lied a lot. They lied about the true buyers, and they lied about the source of the down payments, and they lied about the value of the properties, and they lied about the income and employment of the buyers, and they lied about whether the buyers would occupy the properties, and they lied about whether any other properties owned by the buyers were being leased.

Hill and his associates lied about the true owners of the properties in order to disguise the fact that Hill-owned entities were behind all of the transactions and were actually selling the properties to themselves. Unbeknownst to the lenders, Hill had recruited people with good credit scores to serve as straw buyers of the properties. He even had some of them purchase several properties from him using loans from different lenders, all of which were obtained within a short period of time so that each successive lender would not find out about the other loans to that borrower. Once multiple loans or mortgages showed up on the buyer's credit

4

report, which typically took a few weeks, it became difficult for that buyer to qualify for new loans. At that point, the buyer's usefulness to Hill was at an end and he would recruit a new buyer.

Hill and his associates lied about the source of the down payments to cover up the fact that Hill had supplied most or all of that money to the straw buyers. Lenders want to know that money for a down payment actually comes from the buyer because a buyer who has a substantial stake in the property is considered a better credit risk. That is why they inquire about the source of a down payment before making a loan. Hill circumvented that safeguard in a variety of ways. Sometimes Hill or an associate would give a borrower money to park in her bank account just long enough for the lender to verify the money's presence, then they would take it back. Other times they falsified the HUD-1 settlement statements[1] that were signed at the closings to show "cash from borrower" when the money had actually come from Hill, an entity he controlled, or one of his associates. Yet other times cashier's checks were forged or altered to show earlier earnest money payments from the buyers to Hill as seller, when in fact that money had come from

---

[1]"The Housing and Urban Development-1 ('HUD-1') statement is a settlement form used in closing a property sale; it details the costs and fees associated with a mortgage loan." Busby v. JRHBW Realty, Inc., 513 F.3d 1314, 1319 (11th Cir. 2008) (citing United States v. Gaudin, 515 U.S. 506, 508, 115 S.Ct. 2310, 2312 (1995); Briggs v. Countrywide Funding Corp., 188 F.R.D. 645, 646 (M.D. Ala.1999)).

other sources. The false checks were created by altering actual checks from the bank account of a straw buyer. With most or all of the loans, the borrowers signed documents at closing falsely representing that they were supplying the down payment money.

Hill and his associates lied about the value of the properties to circumvent lenders' loan-to-value requirements and increase the selling price. Those lies were told through fraudulently inflated property valuations that Hill procured. For example, a bank would make a loan for $200,000 under the assumption that it was lending 80% on a property worth $250,000, when in reality the bank was lending 133% on a property worth only $150,000. To pull this off Hill needed the cooperation of appraisers, and he bought what he needed. The appraisers supported their inflated valuations by cherry-picking inappropriate comparative sales; by concealing recent prior sales of the same property for far lower amounts; by including upgrades that had not actually been done; and by neglecting to report conditions that would depress property values, such as a property's proximity to railroad tracks or a landfill or its infestation with black mold.

Hill and his associates lied about the straw buyers' income on the loan applications in order to qualify the buyers for loans of the size they were seeking. And those lies in turn required lies about the buyers' employment and positions to

avoid arousing suspicions about the reported income. As part of the lies some borrowers got "promoted" on their loan applications. For example, Eddie Blanchard, a postal clerk in a small Louisiana town, became "Postmaster of Atlanta" on his application. Other buyers acquired impressive-sounding executive titles at companies where they had never worked or at companies that did not even exist. If the lenders tried to verify the employment and income information, Hill's associates would generate fake W-2s and pay stubs, or they would answer phone calls posing as the borrower's employer.

Hill and his associates lied about the intended use of the properties in order to get the better loan terms and interest rates available for owner-occupied properties. Lenders operate on the assumption that a borrower will be more motivated to make payments on his own home than on an investment property, which is why investment loans require higher interest rates and larger down payments. As for condominiums, some developments had restrictions on the percentage of units that could be rented out, and many lenders would not lend on condominium units if the complex's owner-occupancy rate was below a certain level. Carrying out Hill's instructions, straw buyers represented on each loan application that they intended to use the property as their "primary residence," even though they actually were buying multiple properties and had no intention of

7

moving into any of them. Some of the buyers slipped up and pointed this out at closings. Most of them were told by those conducting the closing (who were being paid by Hill) that they had to say they were going to occupy the property in order to get the loan. Other buyers signed their name to blank application forms, leaving Hill and his associates to generate whatever false information was necessary to meet the lender's underwriting standards.

Hill and his associates lied about whether any residences that the buyers already owned and occupied would be leased in order to cover up the fact that the new properties would not be used as residences. Again, owner-occupied housing attracts better loan-to-value ratios than investment property does. And the straw buyers who did disclose to lenders that they were buying the properties for investment needed to show that the properties would produce enough rental income to cover the mortgage payments. Hill and his associates met this need by generating fake lease contracts with nonexistent tenants or by grossly inflating the income generated by properties that actually were rented.

Hill's scheme needed not only a lot of lying liars but also a slew of straw buyers. Hill recruited the straw buyers by pitching a business model that supposedly involved buying distressed properties at a discount, renovating and furnishing them, renting them out on lucrative short-term leases to corporate

8

executives, athletes, and entertainers, and later selling them for a handsome profit. He told his "investors" — the straw buyers — that they would not have to put any of their own money into the deal, just their name and good credit. Hill assured them that he would take care of mortgage payments, taxes, insurance, association fees, and all other expenses, and that he would maintain the properties, lease them, and collect the rents.

After the straw buyers purchased properties, Hill would have them sign quitclaim deeds, conveying the properties back to him. Those quitclaim deeds were concealed from the lenders, and they were not recorded until Hill was ready to resell the property. Ordinarily, the earlier mortgages would have been picked up on a title search before a later loan was made, but Hill bribed some of the attorneys doing the closing work to report clear title to the lenders. In that way he was able to run some of the properties through the lending process more than once, thereby generating a second or third round of illicit gains.

In order to get the money he needed for the down payments that the straw buyers fraudulently claimed to have provided at their closings, Hill borrowed "hard money" — short-term cash loans at double-digit interest rates — from wealthy acquaintances like Fred Filsof and John Kruger. The success of the scheme depended on the fraudulently obtained loan proceeds coming in fast

9

enough to pay off the hard money loans. The only way Hill could stay current on existing mortgage loans was by using the incoming flow of sales proceeds. Eventually the whole house had to collapse. Within a few months of their closings, straw buyers found themselves besieged with letters and phone calls from banks complaining that payments on their loans were not being made. Hill promised the straw buyers he would take care of the payments, but he never did. Once their credit was ruined, they were no longer of any use to him and he quit returning their calls.

Although all of the buyers had good credit scores before they met Hill, most of them lacked the assets to make down payments on the properties. Many would have had difficulty making the payment on a single loan, let alone on the multiple mortgages that were taken out in their names. Although some (maybe all) of the borrowers suspected something fishy was going on, they played their roles anyway. When questioned, some of them claimed that they thought that the transactions must be legal because there were attorneys present at the closings. The attorneys, however, made a point of leaving the room when the checks were passed around.

In return for their part in the scheme, the buyers were paid anywhere from $10,000 to $40,000 for each loan transaction. As some of them later testified at

trial, however, those payments were not worth the damage done to their credit records once the loans went into default and the mortgages were foreclosed.

Those Hill lured in as straw buyers were not the only ones who were injured by the scheme. The neighborhoods where the properties were located suffered from depressed housing values because of the foreclosures that always followed the purchases. The collateral damage from Hill's fraud was even worse at the condominium complexes because, as we have mentioned, once the percentage of investor-owned units exceeds a certain threshold, lenders generally will refuse to loan money for any other units in that complex. At complexes where Hill had bought and flipped numerous units, the value-distorting fraudulent appraisals, foreclosures, and related litigation between Hill and the condominium associations destroyed value, tied up title, and made it difficult or impossible for the hundreds of legitimate owner-occupiers to sell or refinance their own units. Because Hill's units failed to pay their dues, the complexes also lacked the funds necessary to maintain common areas, which further depressed the value of the properties.

B. Hill's Associates[2]

---

[2] Although numerous people were involved in every step of Hill's scheme, in order to simplify the discussion in this subsection, we name only those who were prosecuted in this case.

11

Hill could not carry out such a sophisticated scheme without plenty of help. He had a swarm of loan brokers, closing attorneys, appraisers, assistants, and recruiters.

Leslie Rector began working for Hill during the summer of 2000 and became his right-hand man. He was responsible for managing, coordinating, and facilitating Hill's scheme, and he worked with all of the key co-conspirators, including the straw buyers, recruiters, brokers, appraisers, and closing attorneys. He supplied the false lease agreements used to obtain loans, and after the closings he got the straw buyers to sign quitclaim deeds conveying the properties back to Hill in return for a promise that Hill would make the mortgage payments for them.

Several mortgage brokers, including Robert Powers, actively deceived the lenders by representing that the borrowers intended to use the properties as a primary residence, or by concealing the true origin of the down payments. Appraisers such as Fred Farmer and Barbara Brown performed fraudulent appraisals on the properties, giving them inflated values and concealing earlier sales so that the buyers could obtain more money from lenders than the properties were actually worth.

To feed the scheme's appetite for straw buyers, Hill used a network of recruiters. Marcus Alcindor, Riley Graham, Christine Laudermill, and David

Thomas all recruited straw buyers by telling them that they would be purchasing the properties for Hill when in reality they were buying them from him. The recruiters would promise the buyers that Hill would pay the mortgages on their "investment properties." Cheryl Denny, David Thomas, and David Van Mersbergen were among the large number of people who served as straw buyers for properties associated with Hill.

## C. The Properties

Hill's scheme involved a host of houses, condominium units, and some residential lots in the Atlanta area. Some of the properties had been on the market for months without selling. After Hill bought them, he immediately re-sold them at much higher prices to his straw buyers in deals financed by fraudulently procured loans. Some of the properties Hill bought had fallen into a bad state while they sat vacant, but that did not stop him from using them. For example, after buying one house for $1.4 million, Hill used an inflated valuation to re-sell it to a straw buyer for $2.8 million, even though the house was infested throughout with black mold.

In a similar fashion, Hill bought and resold one group of residential lots. He used one of his companies, Estates Atlanta, Inc., to purchase 34 residential lots and six completed homes located in the Cascade subdivision. Later, Marcus

Alcindor and Riley Graham (aka Riley Williams) formed the Alcindor-Williams Group, LLC, which bought 27 of the 34 Cascade lots from Estates Atlanta with a loan from Centrum Financial. In their loan application Alcindor and Graham made several false statements and representations, including a fraudulent financial statement and falsified sales agreements between Estates Atlanta and straw buyers of some of the lots. The loan request also included a fraudulent appraisal that valued the 27 lots at $2.7 million but failed to reveal the earlier purchase of all 34 lots for less than that amount or that these "luxury" lots were actually bordered by a railroad track and a landfill.

Like the fraudulent loans on houses and condominiums, Alcindor and Graham had to show Centrum that they had a stake in the Cascade venture in order to qualify for the loan. To make that showing, they presented Centrum with altered checks as evidence of their payments for marketing work that was never actually done, Hill perjured himself in an affidavit stating that the Alcindor-Williams Group had paid him $150,000, and Alcindor and Graham presented at closing a check that was supposedly paid to Hill, when it actually came from Hill.

Unbeknownst to Centrum, the Alcindor-Williams Group had entered into an agreement with Hill, through Estates Atlanta, for a second loan secured by a promissory note that was to be funded by the money they made from fraudulent

14

sales to straw buyers of three Hill-owned houses in the Cascade subdivision. Hill then used those fraudulently obtained loan proceeds to pay off one of his own creditors who had loaned him money on the lots.

### D. The Charter Bank Fraud

Once mortgage lenders began to catch on to the fraud, several quit dealing with Hill. Desperate to keep the hive humming, Hill sought out a new source of financing. Christopher Baker, a banking client of Charter Bank, introduced him to Fred Vargas, a vice president at Charter. Baker presented Hill as someone who needed a loan and who also could provide Vargas with an exciting real estate opportunity. Vargas was excited by the Hill investment scheme and the chance to make some quick money. He bought several condominiums from Hill at "discounted" prices with the intention of flipping them at a profit and replacing the money he had stolen before anyone noticed it was gone. In order to finance his purchase of those properties, Vargas stole money from the bank by using fraudulently created lines of credit.

Exploiting the opportunity presented by his new confederate in crime, Hill got Vargas to issue lines of credit to two Hill-controlled entities, Atlanta Condo Parking and Storage and Atlanta Millennium, which were supposedly secured by extra parking spaces for sale in condominium complexes and by (nonexistent)

15

"accounts receivable." Because Vargas only had authority to make loans of $100,000 or less without seeking the approval of a supervisor, he set up two separate lines of credit for the two Hill entities, one at $90,000 and one at $80,000. After Hill defaulted on these loans, as did a suspiciously high number of other borrowers who had worked with Vargas, the bank investigated and uncovered Vargas' scheme in late 2002, which eventually led to his resignation from the bank in March 2003.

## E. The Investigation

Lenders began investigating after they noticed a high number of loan defaults associated with certain brokers. During their internal investigations, auditors uncovered falsified information and valuations in some loan applications. In 2001 Fannie Mae began an investigation, and then the IRS initiated its own criminal investigation. Investigators approached several participants in August and September of 2001 to discuss plea deals. In the meantime, Hill kept his scheme going by continuing to fraudulently "flip" houses and condominiums well into 2003 despite his awareness from late 2001 onward that he was under investigation; he was even receiving subpoenas during that time.

Wayne Jenkins and Ted Tagalakis, loan brokers who had worked for Hill, began cooperating with the government's investigation in late 2001 and early

2002. Each of them pleaded guilty in separate cases and received reduced sentences in exchange for their cooperation and testimony at trial.

Rector, who was Hill's second in command, was approached by investigators in February 2003. He began giving interviews and providing documents, and he continued cooperating well into 2005 until negotiations broke down, and he was indicted in January 2006.

Vargas began cooperating with the government's investigation near the end of 2003, implicating Hill in the Charter line of credit fraud. In May 2004 Vargas pleaded guilty in a separate case to charges of conspiracy and bank fraud and was sentenced to 51 months imprisonment. After he testified for the government in this trial, his sentence was reduced under a Rule 35 motion to 26 months. See Fed. R. Crim. P. 35.

In November of 2004, Hill, Baker and other Vargas bank clients were indicted in a case involving the Charter line of credit conspiracy. Hill's case was later severed from that one and the charges against him were consolidated with others in this case.

## II. Procedural History

### A. The Indictment

This case went to trial on the third superseding indictment, which was returned in November 2006. It charged 18 defendants with a total of 187 counts, including three separate conspiracies and a host of substantive counts.[3] The charges were grouped around each of the three conspiracies.

The first group of charges, Counts 1 through 14, charged Hill and Baker with conspiracy to defraud Charter Bank and Trust in violation of 18 U.S.C. § 371; with bribing Vargas in connection with Charter's business and transactions in violation of 18 U.S.C. §§ 215(a)(1); with two instances of bank fraud in violation of 18 U.S.C. § 1344; with four instances of making false statements to influence the credit decision of a financial institution in violation of 18 U.S.C. § 1014; and with six instances of money laundering in violation of 18 U.S.C. § 1957.

The second group of charges, Counts 15 through 18, charged Hill, Alcindor, Moss, Baker, and Graham with conspiring to defraud Centrum Financial Services

---

[3] Several defendants who had been charged in earlier incarnations of the indictment or separately by information opted to plead guilty, including: appraiser Julian Perez and his assistant Jeremy Dercola; loan brokers Wendell Higgs, Brant Petree, Wesley Golden, and Michael Flake; recruiters Rashid Muhammad and Willam Chavis; straw buyer Cortney Jackson; and closing attorneys Chris Halcomb and Andrew Wolf. Perez, Higgs, Petree, Muhammad, Chavis, Halcomb, and Wolf all testified for the government at trial.

Apart from the nine appellants, defendants who were named in the third and final superseding indictment included: Hill associate Christopher Baker and straw buyer Carl Best, for whom arrest warrants were still outstanding at the time of trial; straw buyer Cheryl Denny and marketing consultant James Moss, who were acquitted in this trial on Rule 29 motions; recruiter and straw buyer Dean Thomas (brother of David Thomas, an appellant who was also a recruiter and straw buyer), who was convicted in this trial but did not appeal; and straw buyer Annette Spear, who was severed from this trial along with Graham.

in connection with the sale of the 27 lots in the Cascade subdivision to the Alcindor-Williams Group in violation of 18 U.S.C. § 371, and with three substantive counts of wire fraud in violation of 18 U.S.C. § 1343.

The third group of charges begins with Count 19, which charged that all of the appellants conspired with each other and with Carl Best, Annette Spear, Dean Thomas, William Chavis, Cheryl Denny, Michael Flake, and Graham to defraud various mortgage lenders in violation of 18 U.S.C. § 371. Counts 20 through 33 charged those defendants with making false statements to influence the credit decision of a bank in violation of 18 U.S.C. § 1014, with each charge relating to the particular mortgage loans in which each defendant was involved. Counts 34 through 38 charged specific instances of mail fraud related to mortgage loans in violation of 18 U.S.C. § 1341, and Counts 39 through 48 charged specific instances of wire fraud related to mortgage loans in violation of 18 U.S.C. § 1343. Counts 49 through 181 charged money laundering related to transactions involving the proceeds of the frauds alleged in the prior counts of the indictment in violation of 18 U.S.C. §§ 1956 and 1957. Finally, Counts 182 through 187 charged additional counts of credit application fraud related to mortgage loans obtained from Flagstar Bank in violation of 18 U.S.C. § 1014.

## B. Pretrial Motions

Alcindor, Rector, Van Mersbergen, Moss, David Thomas, Graham, and Annette Spear moved to sever their cases. The court granted Graham's motion after finding that his insistence on proceeding pro se would cause delay and distraction at the main trial. It granted Spear's motion for a severance because the only evidence of her involvement stemmed from her prior relationship with Graham.[4]

Before trial, a dispute arose over Rector's proffer agreement when the government moved in limine to bar the defendants from mentioning in their opening statements that they had tried to cooperate by making proffers and that the government only prosecuted them because it was dissatisfied with what they had to say. Rector responded to the government's motion by filing a motion in limine of his own to enforce the part of the proffer agreement that barred the government from using proffer-derived evidence against him except in limited circumstances. Because the motions were filed just before trial, the district court opted to take them under advisement.

## C. Trial

---

[4] The government dropped all charges against Spear before Graham went to trial. Graham was convicted in a separate trial and his appeal was consolidated with this one. In a separate opinion issued today, we are affirming Graham's conviction. See United States v. Graham, No. 08-14736 (11th Cir. 2011).

The nine appellants — Hill, Alcindor, Powers, Laudermill, Van Mersbergen, Farmer, Rector, David Thomas, and Brown — plus Dean Thomas, Cheryl Denny, and James Moss pleaded not guilty and went to trial. The trial lasted from January 16 through March 14, 2007. The government's case consisted of 1,135 exhibits and the testimony (or stipulation about the testimony) of more than 100 witnesses, some of whom were cooperating co-conspirators. Others were officials or agents of the victim lenders. An investigating agent also testified to provide, among other things, an overview of the case.

The district court worked hard to keep the trial from getting out of control and consuming even more time and resources than it did. In the interests of efficiency and judicial economy, the court limited opening statements, sometimes restricted cross-examination, urged both sides to stipulate to the authenticity of various records and to what lenders would say, and in the presence of the jury encouraged both the prosecution and the defense to "move on." In exchange for the defendants' making reasonable and appropriate stipulations at trial in order to streamline the proceedings, the court promised to reward their cooperation at sentencing, and on at least one occasion the court intimated that failure to do so might lead to less favorable treatment at sentencing.

At the end of the government's case in chief, the court heard arguments on the defendants' Rule 29 motions for judgments of acquittal. Each defendant went in alphabetical order, beginning with Alcindor. The court granted Alcindor's motion for acquittal on Counts 38 and 94, agreeing with him that the evidence on those counts pointed only to the companies controlled by Alcindor and Graham and did not show Alcindor's individual involvement.[5] The court granted a judgment of acquittal for Cheryl Denny and James Moss on all counts after concluding that there was insufficient evidence that their involvement in the scheme was with knowledge of the fraud. The court denied the other defendants' Rule 29 motions. And after reconsidering the matter, the court reversed its earlier ruling that had granted Alcindor's motion for acquittal on Counts 38 and 94.

Following the rulings on their Rule 29 motions, the defendants presented some evidence and witnesses. The strategy that they pursued was to argue that they acted in good faith and lacked any criminal intent because they had no idea that what they were doing was criminal. That strategy may have been hampered by the fact that none of the defendants took the stand. Nor did they present a

---

[5] Both of those counts related to the August 2002 mortgage loan transaction on the house at 105 Beracah Walk, a deal for which Graham had recruited Cortney Jackson to act as a straw buyer. Count 38 charged mail fraud based on the mailing of the deed from the county clerk's office, and Count 94 charged money laundering for the wiring of loan proceeds to the account of Bristol Homes, a company controlled by Alcindor and Graham.

22

united front.  The defendants who were Hill's associates and subordinates pointed the finger at him, while Alcindor blamed Graham, and Hill claimed innocence and reliance on the advice of counsel as a defense.

The jury was instructed on March 5, and it returned its verdict on March 14, 2007, following eight days of deliberations.  The jury delivered split verdicts on Farmer, Hill, Rector, and Dean Thomas, finding them guilty on some counts and not guilty on others, while Alcindor, Brown, Laudermill, Powers, David Thomas, and Van Mersbergen were found guilty on all counts.

### III.  The Severance Motions Issues

Before trial, Powers filed a motion for severance based on, among other things, antagonistic defenses.  Rector and Van Mersbergen also filed motions for severance, contending that they should be tried separately because they were charged with only one of the three conspiracies alleged in the indictment.  Although Alcindor made no motion of his own, he did adopt the severance motions of co-defendants Rector, Dean Thomas, and James Moss.  The Thomas motion stated as its ground antagonistic defenses, while Moss' motion contended that because the evidence in his case was the same as that in Riley Graham's case he should be tried with Graham, who was likely to be granted a severance.[6]

---

[6] The district court had indiciated that it was inclined to grant a motion for severance if Graham should file one because Graham insisted on representing himself, which would have

23

We review a district court's denial of a motion for severance only for an abuse of discretion. United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005). In determining whether a joint trial is appropriate, the district court must "balance the prejudice that a defendant may suffer from a joint trial, against the public's interest in judicial economy and efficiency." United States v. Cross, 928 F.2d 1030, 1037 (11th Cir. 1991). We are "reluctant to reverse a district court's denial of severance, particularly in conspiracy cases, as generally persons who are charged together should also be tried together." United States v. Knowles, 66 F.3d 1146, 1158 (11th Cir. 1995) (quotation marks omitted). A district court's denial of a severance warrants reversal only if the defendant can demonstrate that the denial was a "clear abuse of discretion" and that as a result he suffered "compelling prejudice against which the district court could offer no protection." United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993). A defendant may show that he suffered compelling prejudice by demonstrating "that the jury was unable to sift through the evidence and make an individualized determination as to each defendant." United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997) (quotation marks omitted).

## A. Rector

disrupted and slowed down the trial of the other defendants.

24

Rector contends that it was an abuse of discretion not to grant him a severance because the indictment charged three separate and distinct conspiracies, two of which did not implicate him. Because the other two conspiracies differed in time, in some of the participants, and in factual particulars from the residential mortgage fraud scheme charged against him in Count 19, he argues that his case was improperly joined under Federal Rule of Criminal Procedure 8(b) and should have been severed under Rule 14.

Rule 8(b) provides that: "The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," and the "defendants may be charged in one or more counts together or separately," but they "need not be charged in each count." Fed. R. Crim. P. 8(b). Although Rector was not charged with crimes in connection with two of the three conspiracies, the Count 19 conspiracy with which he was charged is the big one. He was actually charged in two-thirds of the counts (121 of 187) in the indictment.[7]

In any event, "separate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions." United States v.

---

[7] Rector was charged in Counts 19, 20–33, 34–48, 63–94, 129–187.

Weaver, 905 F.2d 1466, 1476 (11th Cir. 1990) (quotation marks and alteration omitted). In this case the three conspiracies and the various substantive counts arrayed around them were properly joined because each of the charges arose out of Hill's master scheme to defraud lenders through a common plan and design. The fact that Hill used a different set of actors to perform the three acts of his play did not transform it into three different plays.

Rector has also failed to demonstrate that he suffered any specific and compelling prejudice from the court's refusal to sever his case from that of his co-defendants. Most of the evidence that was introduced at trial related to the 121 counts with which he was charged. But even if, as Rector asserts, there had been an "enormous disparity" in the amount of evidence that related to other defendants or charges compared with the evidence that related to him, "[a] defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants." Schlei, 122 F.3d at 984 (quotation marks omitted). Although the district court, in the interests of efficiency and judicial economy, understandably refused to give the jury a curative instruction every time evidence irrelevant to the charges against Rector was introduced, the court did give the jury a closing instruction that it must

26

consider the evidence separately as to each defendant with respect to each charge.[8]

We generally presume that jurors follow their instructions.  Greer v. Miller, 483

U.S. 756, 766 n.8, 107 S.Ct. 3102, 3109 n.8 (1987); United States v. Stone, 9 F.3d

934, 938 (11th Cir. 1993).  More specifically, we apply "the strong presumption . .

. that jurors are able to compartmentalize evidence by respecting limiting

instructions specifying the defendants against whom the evidence may be

considered."  United States v. Blankenship, 382 F.3d 1110, 1123 (11th Cir. 2004).

Even without presumptions, it is obvious that the jury followed the court's

instructions in this case.  After deliberating for eight days, the jury acquitted

Rector of 25 of the 121 charges against him, a result that demonstrates  the care

with which the jury sifted through the evidence and considered the charges.  See

United States v. Baker, 432 F.3d 1189, 1237 (11th Cir. 2005) ("In evaluating a

---

[8] The district court gave the following instruction regarding the jury's consideration of the evidence as to each defendant:

> Now, ladies and gentlemen, a separate crime or offense is charged against one or more of the defendants in each count of the indictment.  Each charge and the evidence pertaining to it should be considered separately.

> Also the case of each defendant should be considered separately and individually.  The fact that you may find any one or more of the defendants guilty or not guilty of any of the offenses charged should not affect your verdict as to any offense or any other defendant.

> I caution you, members of the jury, that you are here to determine from the evidence in this case whether each defendant is guilty or not guilty.  Each defendant is on trial only for the specific offense alleged in the indictment.

jury's ability to sift through the evidence presented and to make individualized interpretations of guilt, an appellate court may consider whether the jury issued a 'split' verdict, finding guilt as to some defendants or charges but not as to others. Split verdicts weigh against a finding of undue 'spillover.'"). The district court did not abuse its discretion by denying Rector's motion for a severance.

## B. Van Mersbergen

Van Mersbergen contends that it was an abuse of discretion for the district court not to grant his severance motion because he was prejudiced by the district court's efforts to effectively manage the unwieldy trial of 12 defendants. Before voir dire, the district court determined that the government would be given 10 peremptory strikes and the defendants would be collectively allotted 16, and the court permitted the defendants to determine the method they would use to exercise those strikes. When the defendants failed to reach an agreement about that, the court allotted one strike to each of the defendants and then distributed the remaining four strikes to the defendants who would figure most prominently in the trial: two to Hill, one to Farmer, and one to Rector. The district court then devised a rotating method for exercising the strikes under which the defendants would exercise two strikes and the government one until all of the strikes were used.

The district court also decided that instead of permitting counsel for each of the 12 defendants and an attorney representing the government to question prospective jurors, the court would do the questioning. Counsel for each party was allowed input into the questions that would be asked and also allowed to suggest follow-up questions. Opening statements were limited to accommodate the number of attorneys involved. Each defendant was given 15 minutes, except for Powers and Farmer who were given 20 minutes each, Rector who was given 30 minutes, and Hill who was given 45 minutes.

Van Mersbergen argues that he was prejudiced as a result of the joint trial because the large number of defendants resulted in his peremptory strikes being reduced from the normal 10 to only 1; his counsel was not allowed to question prospective jurors directly; his time for opening statements was reduced; he was not permitted a full opportunity to further develop his Batson challenge; and one witness was allowed to testify that when he heard Hill's sales pitch (outside the presence of Van Mersbergen), the witness had told Hill that what he was describing was mortgage fraud.

Van Mersbergen did not properly raise all of these prejudice arguments in the district court. He did adopt the motions of his co-defendants, but their motions did not assert that a severance was necessary to avoid all of the types of

prejudice that Van Mersbergen now argues the district court should have considered. Instead, the co-defendants' motions that Van Mersbergen adopted asserted only that a failure to sever would result in three types of prejudice: reduction in the number of peremptory strikes each individual defendant was allotted, curtailment of the jury voir dire that might otherwise occur, and a reduction in the time given each defendant for opening statement.[9]

The district court did not abuse its discretion by concluding that the interests of efficiency and judicial economy outweighed any prejudice that might befall Van Mersbergen in a joint trial with his co-defendants. Although he was not allowed to individually exercise the number of peremptory strikes that he would have had if tried separately, Van Mersbergen and his co-defendants were

[9] While our review probably should be limited to those three asserted types of prejudice, we will address the other two here as well because Van Mersbergen's contentions about them clearly are meritless. The first is his argument that the district court's failure to sever resulted in his inability to further develop his Batson challenge because the court refused to hear further argument from the defendants after it ruled that they had failed to make out a prima facie case of discrimination based on the government's use of its peremptory strikes. Absent a prima facie case, a Batson claim fails, so the district court's denial of the claim rises or falls on the correctness of its prima facie case ruling, which we will discuss in Part IV B of this opinion. There is no indication that the district court would have allowed any further argument on that issue if there had been fewer defendants, and Van Mersbergen has not described any additional arguments he would have made in the district court if he had been given the opportunity to do so.

Van Mersbergen's other belated assertion of prejudice involves the testimony of Paul McCoury, a loan officer, that when he had declined to participate in a similar scheme that Hill had pitched to him in 1999, he told Hill that "what you're describing to me is mortgage fraud." No one moved for a severance based on that testimony and, in any event, the district court instructed the jury that it was to consider the evidence separately as to each defendant. See supra n.8.

30

jointly given 16 strikes, which is more than the 10 strikes normally allotted to a defendant or to jointly tried defendants under Rule 24(b)(2) of the Federal Rules of Criminal Procedure. There is no constitutional right to peremptory strikes, Rivera v. Illinois, ___, U.S. ___, 129 S.Ct. 1446, 1453 (2009), and the rotation-sharing method used for the exercise of the defendants' joint strikes in this case is similar to one that we approved in United States v. Romero, 780 F.2d 981, 984 (11th Cir. 1986) (upholding a district court's use of six rotating rounds of peremptory challenges in a case involving multiple defendants).

As for the attorneys not being allowed to directly question the venire members, a district court has discretion about how to conduct voir dire, including whether to have counsel submit questions in writing. United States v. Brooks, 670 F.2d 148, 152 (11th Cir. 1982). The same goes for the amount of time allotted for opening statements. United States v. Zielie, 734 F.2d 1447, 1455 (11th Cir. 1984), abrogated on other grounds by Bourjaily v. United States, 483 U.S. 171, 177–79, 107 S.Ct. 2775, 2779–80 (1987), as recognized in United States v. Chestang, 849 F.2d 528, 531 (11th Cir. 1988). Van Mersbergen has failed to convince us that the district court abused its discretion in taking the reasonable steps it did to manage the difficulties presented by trial of a case of this magnitude,

considered either apart from or in the context of the denial of his motion for severance.

Van Mersbergen also insists that because he was charged with only one of the three conspiracies his due process rights were violated by the joint trial. Although he was charged as part of the big Count 19 conspiracy, Van Mersbergen was named in only 14 of the counts, which involved only three of the properties. To the extent that he claims he was a victim of "spillover" prejudice or transference of guilt, however, his claim fails for the same reason as Rector's. While there was less evidence relevant to the charges against Van Mersbergen than to all of the charges against his co-defendants, that fact is not enough to demonstrate compelling prejudice. If it were enough, in every joint trial the defendant facing the fewest charges with the least amount of evidence would be automatically entitled to a severance. Then, the next defendant left who faced the fewest charges and least amount of evidence would be automatically entitled to a severance, and so on, until only one or a few defendants remained in the trial. That cannot be, and it is not, the law.

Even though Van Mersbergen was convicted on all 14 counts against him, the fact that the jury returned split verdicts against some of his co-defendants shows its ability to separate out the charges and evidence. A defendant cannot

32

demonstrate that he suffered compelling prejudice merely because the jury ultimately concluded that he was guilty as charged. For all of these reasons, the district court did not err by denying the severance motions of Van Mersbergen or those of his co-defendants that he was deemed to have adopted.

## C. Alcindor

Alcindor presents us with the novel theory that the district court abused its discretion by refusing to sever him from the joint trial so that he could be tried together with Graham, who had been granted a severance. Alcindor's contention is that it violated due process to try him separately from Graham, because that permitted the government to advance in the two trials inconsistent positions regarding the culpability of the two men for the fraud on Centrum Bank. There are a number of reasons that contention does not entitle him to a new trial.

First, Alcindor failed to assert the potential for inconsistent prosecution theories as a ground for a severance in the district court. He did not file his own severance motion but instead adopted those of three of his co-defendants, none of whom asserted that severance should be granted to permit the movant to be tried with Graham in order to foreclose the possibility of the government pursuing inconsistent theories of guilt. We will not hold that the district court abused its discretion in failing to grant a severance on a ground that was never brought to its

attention.  The best that Alcindor is entitled to is plain error review, and the failure to grant a severance in these circumstances does not qualify as plain error by any stretch of the imagination.

For one thing, Alcindor's contention suffers from a fundamental flaw.  The last severance motion was denied in this case in December of 2006, the trial itself was over in March of 2007, and Graham's trial did not begin until February of 2008.  At the time the district court denied the severance motions in this case, neither Alcindor nor anyone else had suggested that the government might pursue inconsistent theories of prosecution in Alcindor's and Graham's trials, and there was no reason to believe that it would.  We do not require that trial courts be clairvoyant and grant motions on grounds not asserted because of events that have not yet happened.  Instead, they may treat as gospel the age-old advice to take "no thought for the morrow:  for the morrow shall take thought for the things of itself.  Sufficient unto the day is the evil thereof."  Matthew 6:34 (King James).

Even putting aside that fatal flaw in Alcindor's position, and assuming for present purposes that trial courts have a duty to foresee the future, it is not at all plain that a defendant has a right to prevent the prosecution from using inconsistent theories to prosecute two separately tried defendants charged with the same crime.  In Parker v. Singletary, 974 F.2d 1562, 1577–78 (11th Cir. 1992), we

rejected a claim that the prosecution violated due process by arguing at the defendant's trial that he was the triggerman while failing to disclose to him that it had argued in the separated trials of his two co-defendants that each one of them had been the triggerman. We stressed that the prosecution in those cases did not use "necessarily contradictory evidence," and "the only inconsistency was in the state's alternative arguments" about what inference the jury should draw from the same evidence. Id. at 1578; see also Bradshaw v. Stumpf, 545 U.S. 175, 190, 125 S.Ct. 2398, 2409–10 (2005) (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories."); Fotopoulos v. Sec., Dep't of Corr., 516 F.3d 1229, 1234–35 (11th Cir. 2008) (concluding that a holding that the presentation of inconsistent theories at the trial of two defendants charged with the same crime did not violate due process was not contrary to clearly established law).

Likewise, there was no "necessarily contradictory evidence" in the two trials involved here. In the trial of this case, as Alcindor points out, the government made little mention of Graham in its opening and closing statements, but that is understandable since Graham was not one of the dozen defendants on trial. At no time during this trial did the government ever take the position that Graham was

not guilty of the Centrum Bank fraud, and at no time during the later trial of Graham did the government ever take the position that Alcindor was not guilty of it. In fact, during the present trial several government witnesses testified to Graham's guilt, and during Graham's trial several testified to Alcindor's guilt. The government's consistent position in both trials was that both Alcindor and Graham were guilty of the Centrum Bank fraud counts.

Alcindor's argument that the government took inconsistent positions focuses on the testimony of Quianna Wasler, Graham's long-time girlfriend, in the two trials. Alcindor claims that in this trial he was unable to succeed with his defense of no criminal intent because government witnesses such as Wasler testified to his personal participation in several components of the fraud against Centrum Financial. According to Alcindor, later at Graham's trial the government used Wasler's testimony to point the finger at Graham who had directed her to participate in the fraud, and by doing that the government was making essentially the same point that Alcindor had sought to establish in his trial — that Graham manipulated Alcindor and others into becoming unwitting participants in his fraudulent scheme.

The fact is, however, that Wasler testified consistently in both trials. She told both juries that: Graham directed her to falsify pay stubs and W-2 forms in

36

the names of straw buyers for the Centrum loan package; she and Graham "inflated" items on Alcindor's personal financial statement; and she and Graham falsified cashier's checks made out to Alcindor and the Alcindor-Williams Group. Wasler's testimony at both trials implicated Alcindor and Graham together in the fraud on Centrum. She testified that both of them were present at the closings for the straw purchases of Cascade lots, and that they both assisted three straw buyers in falsifying the purchases of pre-existing homes in order to finance the purchase of the Cascade subdivision by the Alcindor-Williams Group.

Other matters that Alcindor considers stark inconsistencies between the evidence at the two trials are easily understood in the context of the separate trials, the different defendants, and the inevitable difference in questions asked of the witnesses. How far Alcindor strains to find some differences is apparent from his use of testimony about whether both he and Graham were present at some of the closings. For example, in this trial of Alcindor the government offered testimony that he and Graham were both present at the closings involving the Alcindor-Williams Group, thus undermining Alcindor's defense that he was out of the country at those times. He argues that the testimony he was present at those closings is inconsistent with what Michael Key[10] "made clear" in his testimony at

---

[10] Key was a former closing attorney who testified for the government at Graham's trial about his own involvement in mortgage fraud transactions and how the fraud typically worked.

Graham's trial, which is that only Graham was present at the closings on behalf of the Alcindor-Williams Group. The record shows, however, that Key actually admitted during his testimony at Graham's trial that in addition to Graham "[t]here could have been others" present.

The government's consistent theory was that both Alcindor and Graham were guilty to the gills of the Centrum Bank fraud charges against them, and the evidence at both trials supported that position. We cannot say, to borrow a few key words from an Eighth Circuit opinion, that the government used "inherently factually contradictory theories" and changed the color of its stripes from one trial to the next by advancing an "inconsistency . . . at the core of the prosecutor's [separate] cases against defendants for the same crime." Smith v. Groose, 205 F.3d 1045, 1052 (8th Cir. 2000). Far from it.

So, Alcindor loses on the severance issue because he failed to raise in the district court the inconsistent prosecution theories and evidence ground that he now asserts; because we do not require district courts to foretell that the prosecution theory or evidence in a future trial of a co-defendant will be different from what it is in the trial then before the court; because it is not plain that inconsistent prosecution theories and evidence would violate a defendant's rights; and because, even if they would, Alcindor has not shown inconsistency here.

38

## D. Powers

Powers, who acted as a mortgage broker in some of the transactions, contends that it was an abuse of discretion for the district court not to grant his motion for a severance on the ground of antagonistic defenses. Part of his defense was that he was an innocent participant who had been duped by the straw buyers, while the defense of the straw buyer defendants was that they themselves had been unwitting participants which, if true, would rule out their duping Powers or anyone else. After the court restricted a portion of Powers' cross-examination of Wayne Jenkins, he renewed his motion for severance, and he was joined by Denny, one of the straw buyer defendants.

The law is that defendants indicted together generally should be tried together; the fact that a defendant's chances of acquittal are materially better in separate trials is not enough; a defendant is not entitled to a severance merely because of antagonistic or mutually exclusive defenses; and a defendant must show that the joint trial caused him such compelling prejudice that he was deprived of a fair trial. Zafiro v. United States, 506 U.S. 534, 537–41, 113 S.Ct. 933, 937–39 (1993); see also Blankenship, 382 F.3d at 1125 ("The Supreme Court has held that co-defendants do not suffer prejudice simply because one co-defendant's defense directly inculpates another, or it is logically impossible for

39

a jury to believe both co-defendants' defenses."). Powers clearly has not made that showing. As we said of the two appellants in the <u>Blankenship</u> case, "[a]side from pointing out their mutually antagonistic defenses, however, neither . . . ha[s] shown how the joint trial prejudiced them in any other legally cognizable way." <u>Id.</u> There was no abuse of discretion in denying Powers' motion for a severance.

## IV. <u>Jury Selection Issues</u>

Van Mersbergen contends that the district court erred by not permitting the prospective jurors to be asked during voir dire about each of the witnesses who would testify during the trial.[11] All of the appellants contend that the district court erred in not granting their <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712 (1986), objection to the government's use of its peremptory strikes.

### A. Failure to Ask the Venire About All Government Witnesses

Jury selection took place during two days. As part of its effort to streamline and effectively manage a trial involving so many defendants and attorneys, the district court decided that members of the jury venire would be asked about their familiarity with only the most important witnesses. To that end, the court directed

---

[11] His contention and arguments about this are adopted by five other appellants: Brown, Farmer, Hill, Laudermill, and Powers.

David Thomas also attempts to adopt this argument, but he cannot do so. He entered into a post-conviction agreement with the government in which he received the benefit of a U.S.S.G. § 5K1.1 substantial assistance motion. In return, Thomas agreed to and did waive his right to appeal issues relating to his conviction.

40

both the prosecution and the defendants to submit lists of each side's 10 most important witnesses to be published to the venire instead of the names of the 185 or so potential witnesses on their lists.

Perhaps as a result, the prospective jurors were not asked if they knew a government witness named Brenda Stewart.[12]  Early in the trial Stewart testified that she and her brother had negotiated with Hill for her brother to buy one of the completed houses in the Cascade subdivision and for a new house to be built for herself and her mother on one of the empty lots.  Before those negotiations could be completed, however, Stewart shifted to dealing with Alcindor and Graham who had purchased the Cascade subdivision from Hill through the Alcindor-Williams Group.  Stewart testified that during the course of their dealings she and her brother paid $25,000 in earnest money to Hill and another $7,500 to the Alcindor-Williams Group, money which she was never able to recover after she learned that neither she nor her brother would receive the houses they had contracted to buy.

Shortly after Stewart was called to testify, the court interrupted the government's examination to ask Stewart if she were acquainted with Rosemary Burton.  Burton was one of the alternate jurors, and she had apparently alerted a court security officer that she knew Stewart.  Defense counsel for Farmer and

---

[12] We say "perhaps as a result" because we are unable to locate the name "Brenda Stewart" on the lists of potential witnesses contained in the record.

Brown complained that if Stewart's relationship with Burton had been revealed earlier during voir dire, the defendants could have used a peremptory strike to remove her. The court questioned Burton outside the presence of the other jurors, but in open court, regarding her relationship with Stewart. Burton stated that they worked in different departments and on different floors of the Social Security Administration, and that they were acquaintances who had interacted only on a limited basis. Burton assured the court that she would not give any additional weight to Stewart's testimony and that knowing Stewart would have no effect on her ability to serve as a fair and impartial juror.

The court found that Burton could be fair and impartial, and no defendant asked that she be removed from the jury. Nevertheless, Van Mersbergen contends that the court empaneled a jury in violation of his constitutional right to a fair trial by seating Burton, who he argues should have been struck for cause and would have been if the court had permitted the venire to be asked about all of the names on the witness list. Van Mersbergen further contends that the district court abridged his right to exercise his peremptory challenges by failing to show the jury a complete list of witnesses. He says that if the district court had done so, the relationship between Burton and Stewart would have come to light, and Van Mersbergen would have used one of his peremptory challenges to strike Burton

42

from the jury. Alternatively, he argues that even if the empaneled jury was fair and impartial, reversible error occurred when the government during its closing arguments mentioned Stewart, but not other "investors," by name. Actually, what the government did in its closing was mention Stewart's name along with the names of all of those who were involved in the Cascade/Centrum fraud when it was discussing the details of that fraud.

"The method of conducting the voir dire is left to the sound discretion of the trial court and will be upheld unless an abuse of discretion is found." United States v. Vera, 701 F.2d 1349, 1355 (11th Cir. 1983). It is well established that "[t]he voir dire conducted by the trial court need only provide reasonable assurance that prejudice will be discovered if present." Id. (citation and quotation marks omitted). Any error involving Burton's service on the jury is subject to review only for plain error because no defendant objected to her continued service, asked that she be questioned further, or took issue with the court's finding that she could be fair and impartial. United States v. Raad, 406 F.3d 1322, 1323 (11th Cir. 2005) ("When a defendant fails to object to an error before the district court, we review the argument for plain error.").

Burton's continued presence on the jury could not have been error — much less plain error — because she did not sit on the final jury that rendered the verdict

in this case. Even if Van Mersbergen could convince us that Burton was biased and should have been excluded from the jury, he cannot prove that he was prejudiced by the district court's failure to exclude her because Burton was an alternate juror who never participated in the jury's deliberations.[13] She could not have had any effect on the verdicts in the case. Furthermore, Van Mersbergen has failed to cite to any authority demonstrating that a district court abuses its discretion by failing to publish the government's complete list of witnesses to the venire. We are satisfied that the district court did not abuse its discretion by disclosing to the venire a list that included 41 corporate victims, 8 affected condominium complexes, and the government's 10 most important witnesses, but failed to include Burton.

Van Mersbergen's contention that the court's failure to ask the venire about all of the witnesses, including Stewart, abridged his right to exercise a peremptory strike against Burton fails for similar reasons. Since Burton did not serve on the jury that convicted him, Van Mersbergen was not harmed by the fact that he did not strike her from the jury. Instead, he gained the opportunity to use that strike against another venire member.

B. The <u>Batson</u> Issue

---

[13]When the jury was polled after rendering its verdict, Burton's name was not called.

All of the appellants contend that the government improperly used its peremptory strikes to remove black jurors on the basis of their race, and that the district court erred in denying their challenge of the government's strikes under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986). That decision, of course, established that the Equal Protection Clause forbids the exercise of peremptory jury strikes on the basis of race. In Batson and its progeny, the Supreme Court laid out a three-part inquiry for deciding whether a party's strikes were motivated by race. Id. at 97–98, 106 S.Ct. at 1723–24; see also Snyder v. Louisiana, 552 U.S. 472, 476–77, 128 S.Ct. 1203, 1207 (2008), Johnson v. California, 545 U.S. 162, 168, 125 S.Ct. 2410, 2416 (2005).

First, the district court must determine whether the party challenging the strikes has established a prima facie case by showing facts sufficient to support an inference of discriminatory motive. Johnson, 545 U.S. at 170, 125 S.Ct. at 2417; United States v. Ochoa-Vasquez, 428 F.3d 1015, 1038 (11th Cir. 2005). If a prima facie showing is made, Batson's second step requires the striking party to offer a race-neutral explanation for its strikes. Ochoa-Vasquez, 428 F.3d at 1038. The reason given for the peremptory strike need not be a good reason. It can be an irrational, "silly or superstitious" reason, as long as it is not a discriminatory reason. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771 (1995).

45

However, the ultimate burden of persuasion remains with the party challenging the strike as discriminatory. Id.; Ochoa-Vasquez, 428 F.3d at 1038. In the third and final stage, the district court must evaluate the persuasiveness of the proffered reason and determine whether, considering all relevant circumstances, the objector has carried the burden of proving discrimination. Ochoa-Vasquez, 428 F.3d at 1039.

In this case after the defendants made their Batson objections, the district court initially had the government state some reasons for its peremptory strikes against black venire members, but the court cut that process short by not allowing the appellants to respond fully to the stated reasons. The court denied the Batson claim both on the ground that there was no prima facie case and also on the ground that the government's explanations for its strikes were "legitimate and non-discriminatory." Any error in not allowing the defendants to respond to the stated reasons is purely academic if the court's finding that there was no prima facie case stands. See Ochoa-Vasquez, 428 F.3d at 1038 ("Our precedent makes clear that 'the establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike.") (quoting Central Alabama Fair Housing Ctr. v. Lowder Realty Co., 236 F.3d 629, 636 (11th Cir. 2000)); Lowder, 236 F.3d at 636 ("[T]he threshold task in considering a Batson

challenge, for a district court as well as this Court, is to determine whether a prima facie case was established.  If the answer is no, then the inquiry ceases, and the challenge should be denied.").

For standard of review purposes, "[t]he Batson issue before us turns largely on an evaluation of credibility."  Felkner v. Jackson, ___ U.S. ___, 131 S.Ct. 1305, 1307 (2011) (quotation marks omitted).  Accordingly, "[t]he trial court's determination is entitled to great deference, and must be sustained unless it is clearly erroneous."  Id. (citations and quotation marks omitted); see also United States v. Walker, 490 F.3d 1282, 1292 (11th Cir. 2007) ("We give great deference to the district court's determination of a prima facie case."); Ochoa-Vasquez, 428 F.3d 1015 at 1039 ("We give great deference to a district court's finding of whether a prima facie case of impermissible discrimination has been established."); United States v. Allen-Brown, 243 F.3d 1293, 1298 (11th Cir. 2001) ("[a]pplying the highly deferential standard of review required by our precedent" to the prima facie case determination of the district court); King v. Moore, 196 F.3d 1327, 1334 (11th Cir. 1999) (whether a prima facie showing has been made is "treated as a question of fact to be decided by the trial judge"); United States v. Stewart, 65 F.3d 918, 923  (11th Cir. 1995) ("[W]e give great deference to the district court's finding as to the existence of a prima facie case.");

47

United States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986) ("The question [of whether a prima facie case has been established] is one of fact.").

After some venire members were excused for hardship and others were removed for cause, there remained 54 from which the jury was to be selected. One group of 38 venire members was used to select the first 12 jurors, while the other group of 16 was used to select six alternate jurors. However helpful that division may have been for administrative purposes, the law of this circuit is that in determining whether a prima facie case has been established the peremptory strikes used to select alternates are to be considered together with those used to select the initial 12 jurors. Ochoa-Vasquez, 428 F.3d at 1045 n.41 ("In determining whether a statistical pattern of discrimination exists, our precedent looks to the total number of peremptory strikes available to the striker, including the peremptory strikes against alternates."); see also id. at 1046 (looking to how many of the jurors and alternates were Hispanic); Johnson v. California, 545 U.S. 162, 164, 125 S.Ct. 2410, 2414 (2005) (considering the racial composition of "[t]he resulting jury, including alternates"); United States v. Campa, 529 F.3d 980, 998 (11th Cir. 2008) (considering the fact that "the jury included three black jurors and an alternate black juror") (emphasis added); United States v. Allison, 908 F.2d 1531, 1538 (11th Cir. 1990) (including alternate jurors in the statistical analysis

for prima facie case purposes); United States v. Dennis, 804 F.2d 1208, 1211 (11th Cir. 1986) (considering "the fact that the prosecutor used three of the four peremptory challenges he exercised to strike blacks from the panel of potential jurors and alternates") (emphasis added).

Of the total group of 54 venire members from which the jurors and alternates were struck, 22 (41%) were black, 30 (56%) were white, and 2 (4%) were Asian. The government had, and it exercised, 14 peremptory strikes; it used 9 (64%) of them against black venire members. The final jury of 18 (12 plus six alternates) included nine (50%) blacks. If the government had exercised all of the strikes it could against black venire members, the resulting 18 jurors and alternates would have included only four (22%) blacks.

Under our precedent these statistics, without more, do not establish a prima facie case. In United States v. Campa, 529 F.3d 980, 989 (11th Cir. 2008), the government was allotted 11 peremptory strikes and used 9 of them. Seven of those nine strikes (78%) were used against blacks. Id. The 16 jurors (there were four alternates) who were selected included four (25%) blacks. The district court had found a prima facie case, but we overturned that finding. Id. at 998. Our decision that a prima facie case had not been established was based primarily on the fact that "the government did not attempt to exclude as many black persons as

49

it could from the jury," and the jury with alternates included four blacks.  Id. at 998; see also Lowder Realty Co., 236 F.3d at 638 ("This Court has held that the unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race."); United States v. Puentes, 50 F.3d 1567, 1578 (11th Cir.1995) ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."); United States v. Allison, 908 F.2d 1531, 1537 (11th Cir. 1990) (reasoning that the unchallenged presence of blacks on a jury undercuts the inference of impermissible discrimination that might arise solely from striking other black prospective jurors).

The case for finding no prima facie case is even stronger here than it was in Campa.  Here the government used a smaller percentage of its strikes against blacks than in Campa (64% versus 78%), the number of black jurors it could have but did not exclude was greater than in Campa (five versus two), and there were more blacks left among the jurors who were selected than in Campa (nine or 50% versus four or 16%).  See also Ochoa-Vasquez, 428 F.3d at 1045–46 (no prima facie case where 44 of the 82 (54%) of the venire members were Hispanic, the government used 5 of its 9 (56%) strikes against Hispanics, and 6 of the 17 (35%)

50

jurors and alternates selected to serve were Hispanic); Dennis, 804 F.2d at 1209, 1211 (affirming finding of no prima facie case where "the government did not attempt to exclude all blacks, or as many blacks as it could, from the jury," and "the unchallenged presence of two blacks on the jury undercuts any inference of impermissible discrimination that might be argued to arise from the fact that the prosecutor used three of the four peremptory challenges [the government] exercised to strike blacks from the panel of potential jurors or alternates").

Of course, the prima facie case determination is not to be based on numbers alone but is to be made in light of the totality of the circumstances. Johnson v. California, 545 U.S. 162, 168, 125 S.Ct. 2410, 2416 (2005) (the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose") (quoting Batson, 476 U.S. at 93–94, 106 S.Ct. at 1712); Ochoa-Vasquez, 428 F.3d at 1044 (in order to determine whether a prima facie case has been established "courts must consider all relevant circumstances"). In this case, however, there is no circumstance other than numbers to support an inference of discrimination.

The subject matter of the case can sometimes suggest a motive for discriminatory use of peremptory strikes. Ochoa-Vasquez, 428 F.3d at 1045 n.39 ("In some Batson claims, the subject matter of the case may be relevant if it is

51

racially or ethnically sensitive."). For example, in United States v. Stewart, 65 F.3d 918 (11th Cir. 1995), we noted that "Batson teaches that a prima facie case determination should include an examination of all relevant circumstances," and "[a]mong the relevant circumstances is the subject matter of the case being tried." Id. at 925 (quotation marks omitted). In Stewart, where the challenge was to the defendants' use of peremptory strikes against white venire members, the subject matter weighed heavily in favor of a prima facie case finding because the defendants were Ku Klux Klan members who were being prosecuted for a racially motivated hate crime against blacks. Id. at 921–22, 925–26. Another example is Johnson, where the Supreme Court determined that the defendant had established a prima facie case that the prosecution had used its strikes in a racially discriminatory way against blacks. 545 U.S. at 173, 125 S.Ct. at 2419. In the course of making that determination, the Court quoted with approval a lower court's statement that the fact "a black defendant was 'charged with killing his White girlfriend's child'" was a "highly relevant" circumstance. Id. at 167, 125 S.Ct. at 2415 (quotation marks omitted). Here, by contrast, the subject matter of the case is not the least bit racial. This is a mortgage fraud case in which the victims are colorless institutions. The only relevant color is the color of money, and that shade of green is race neutral.

The fact that the defendants are the same race as the struck jurors is another circumstance that can be relevant to the prima facie case question. See Bui v. Haley, 321 F.3d 1304, 1318 (11th Cir. 2003) (though not dispositive, it may be "noteworthy" for Batson purposes whether defendants or victims are of same race as excluded jurors); Allen-Brown, 243 F.3d at 1298 (race of defendants can be considered as relevant circumstances in evaluating Batson challenge). In this case, however, most of the defendants being tried were not of the same race as the jurors against whom the challenged strikes were made. Nine of the 12 defendants (75%) were white, as were 11 of the 13 (85%) defense lawyers at counsel table. Because the predominant race of the defendants and their attorneys could not have supplied a motive for the government to remove blacks from the jury, it does not weigh in favor of a prima facie case. The appellants have not suggested any other circumstance that points toward the existence of a prima facie case of a Batson violation.

For these reasons, and giving the district court's finding the deference that it is due, we cannot conclude the court erred in determining that the defendants failed to establish a prima facie case that the government used its peremptory strikes in a racially discriminatory manner.

## V. Evidentiary Issues

## A. Lay Opinion Testimony

At trial, the district court permitted several representatives of victim lending institutions, all of whom were involved in mortgage and loan approval for their respective companies, to testify about whether the disclosure of misrepresentations in some of the fraudulent loan applications would have had any effect on their decision to approve the mortgage or loan. Farmer objected to this line of questioning several times, and he now contends that the district court erred by admitting what he characterizes as expert testimony without following the proper procedures for qualifying an expert witness or for disclosing the contents of the expert's testimony as required by Rule 16(g) of the Federal Rules of Criminal Procedure.[14] We review a lower court's decision to admit evidence only for an abuse of discretion. United States v. Kennard, 472 F.3d 851, 854 (11th Cir. 2006).

According to Federal Rule of Evidence 701, a lay witness may offer opinions that are: "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized

---

[14] Brown, Hill, Powers, and Van Mersbergen adopt this argument. David Thomas attempts to do so but cannot because he waived his right to appeal his conviction. See supra, n.11.

54

knowledge within the scope of Rule 702."[15]  Fed. R. Evid. 701.  The Advisory

Committee explained that the purpose of the 2000 amendment that added

subsection (c) to Rule 701 was "to eliminate the risk that the reliability

requirements set forth in Rule 702 will be evaded through the simple expedient of

proffering an expert in lay witness clothing."  Fed. R. Evid. 701 Advisory Comm.

Notes.  Farmer argues that the district court permitted the government to disguise

its experts in lay witness clothing by allowing witnesses from lending institutions

to answer the government's hypothetical questions about their lending decisions

despite the fact that the hallmark of an expert witness is his ability to answer

hypothetical questions.  See United States v. Henderson, 409 F.3d 1293, 1300

(11th Cir. 2005).

As the Advisory Committee made clear and as we have held, however, Rule

701 does not prohibit lay witnesses from testifying based on particularized

knowledge gained from their own personal experiences.  In Tampa Bay

---

[15] Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd., 320 F.3d 1213 (11th Cir. 2003), which the district court relied upon, we addressed whether the amended version of Rule 701 permits an officer or employee of a corporation to offer lay opinion testimony about industry standards and pricing. We concluded that the district court had not abused its discretion in permitting officers and employees to testify as lay witnesses about the reasonableness of their corporation's pricing in light of industry standards. Our reasoning was that their testimony was "based upon their particularized knowledge garnered from years of experience within the field." Id. at 1223. As we noted in Tampa Bay, the Advisory Committee notes to the 2000 amendments specifically carve out the lay opinion testimony of business owners or officers from subsection (c)'s exclusion, and explain that:

> most courts have permitted [owners and officers] to testify . . . without the necessity of qualifying the witness as an . . . expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.

Tampa Bay, 320 F.3d at 1222 (quoting Fed. R. Evid. 701 Advisory Comm. Notes).

Farmer also complains that the lender representatives should not have been allowed to testify about what their institutions would have done had they known that several representations in various loan applications were falsified. He argues

that "the ability to answer hypothetical questions is the essential difference between expert and lay witnesses." Henderson, 409 F.3d at 1300 (quotation marks and alteration omitted). As the Advisory Committee's notes indicate, however, "[t]he amendment does not distinguish between expert and lay witnesses, but rather between expert and lay testimony." Fed. R. Evid. 701 Advisory Comm. Notes. And we held in Tampa Bay that the opinion testimony of a business owner or officer about the manner in which that company conducts its business, which is based on particularized knowledge she gained in her position, is properly treated as lay testimony. Admission of that testimony does not require that she be qualified as an expert under Rule 702.

Most of the lay witnesses who answered hypothetical questions in this case did not do so based on any "scientific, technical or other specialized knowledge," but instead based their testimony on their personal experiences as officers of financial institutions with knowledge of their companies' policies and of the specific transactions at issue. Besides, it does not take any specialized or technical knowledge to realize that lending institutions would be reluctant to approve a loan application if they knew that it contained false statements about material facts. Because of that, there is little or no danger that lay witness testimony was used to evade the reliability requirements of Rule 702. For these reasons, the district court

57

did not abuse its discretion by permitting the witnesses who had personally dealt with the fraudulent loan transactions at issue to respond to the government's questions about what would have happened if the facts had been different.  See United States v. Munoz-Franco, 487 F.3d 25, 35–36 (1st Cir. 2007) (permitting a bank vice president to offer his opinion that the bank's loan classifications would have been improper based on certain facts because his opinion "was based on knowledge of [the bank's] practices that he acquired during his employment there").

As for the witnesses who were not personally involved with the transactions at issue, any error in admitting their testimony was harmless.  United States v. Frazier, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc) (requiring reversal in a criminal case only if erroneously admitted evidence "[had] a substantial influence on the outcome of a case or [left] grave doubt as to whether they affected the outcome of a case") (quotation marks omitted).  Several factors weigh against a conclusion that the erroneous admission of these witnesses' opinions had a substantial impact on the outcome of this case.  One is that other testimony to exactly the same effect by representatives of other institutions with personal knowledge of and involvement in similar transactions was properly admitted, as we have just discussed.  All of the appellants who now claim that the district court

erred, with the exception of Farmer and Brown, invited similar testimony from other identically situated lay witnesses by entering into stipulations about how those witnesses would testify. Farmer and the other appellants failed to object to the same type of testimony by other lay witnesses. And the court explained to the jury that it should consider witnesses' answers to hypothetical questions only to the extent that the facts assumed in the hypothetical questions were proven. In light of those considerations and the overwhelming amount of other evidence presented at trial, we are not left with a grave doubt that the outcome was affected by any error in admitting the testimony. Instead, we are convinced that any such error was harmless.

### B. Summary Charts

Brown contends that she and her co-defendants were subjected to a "trial by charts" in violation of their right to a fair trial because the district court permitted the government to introduce summary charts and to introduce testimony that explained and summarized the contents of the charts without qualifying the witnesses as experts.[16] See United States v. Richardson, 233 F.3d 1285 (11th Cir. 2000). Permitting the use of summary evidentiary charts is within the discretion

---

[16] Farmer, Hill, Laudermill, Powers, and Van Mersbergen adopt this argument. David Thomas attempts to do so but cannot because he waived his right to appeal his conviction. See supra, n.11.

of the district court, id. at 1293, but Laudermill argues that the district court abused its discretion because the charts were misleading, wasted time, and violated various rules of evidence.

The government complied with the requirements of Rule 1006 by making the summary charts and related exhibits available to defense counsel before trial. There was initially some dispute about that, but it was resolved when the government used a copy service to scan all of the exhibits into electronic form and made them available to defense counsel before trial. Even if the charts were improperly admitted, Brown and the other appellants have failed to demonstrate how they were prejudiced by the error. All of the defendants had access to the government's documentary evidence months before trial and to the marked and numbered exhibits themselves before trial, the underlying documents were admitted into evidence before the summaries, and each of the defendants had an opportunity to cross-examine the government's witnesses about the summaries.

Not only that, but Brown and her co-defendants also used the government's charts at various times during the trial — during direct examination, cross-examination, and in their closing arguments. Finally, the district court gave several cautionary instructions regarding the use of the summary charts, and we presume that the jury followed those instructions. United States v. Stone, 9 F.3d

60

934, 938 (11th Cir. 1993) ("The crucial assumption underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge." (quotation omitted)).

## C. Amount of Loss

We also reject Laudermill's contention that the district court committed reversible error by admitting during the trial evidence about the amount of loss that resulted from the fraud and money laundering.[17] Laudermill argues that while the fact of loss had to be proven, the amount of the loss was irrelevant, and the prejudicial effect of the amount of the loss substantially outweighed any probative value it had.

The district court did not abuse its discretion. The amount of the loss, of course, demonstrates the fact of loss. Beyond that, the victims' loss is related enough to the defendants' gain to bear on the motive that the defendants had for committing the fraud. "[M]otive is always relevant in a criminal case, even if it is not an element of the crime." United States v. Sriyuth, 98 F.3d 739, 747 n.12 (3d Cir. 1996). And with financial crimes, the more money, the more motive. We are not surprised that Laudermill has been unable to cite a single decision from any

---

[17] Brown, Farmer, Hill, Powers, and Van Mersbergen adopt this argument. David Thomas attempts to do so but cannot because he waived his right to appeal his conviction. See supra, n.11.

61

court holding that the amount of loss inflicted on the victim by the defendant's crime is inadmissible under Rule 401, Rule 403, or for any other reason.

### D. Alcindor's Evidence About Criminal Intent

Alcindor contends that the district court abused its discretion by excluding as irrelevant evidence that he says would have helped show that he was merely used by Graham. The proffered evidence was that others believed that Graham had taken advantage of them. What others felt about their own roles is not probative of whether Alcindor himself lacked criminal intent, and, in any event, the jury did hear testimony from some other witnesses that they felt used by Graham.

Alcindor also contends that it was an abuse of discretion for the district court to exclude evidence in the form of his "employee service record," which he asserted would show "where he was working, what he was making, [and] how much he gave up" in order to invest with Graham in the Cascade development. Alcindor's position was that his proffered evidence about what he had given up to invest with Graham would show that he lacked any intent to defraud, but that evidence does not make it any less likely that Alcindor did not intend to participate in the fraudulent activities. Alcindor's investment in the scheme reflects a belief that the likelihood and amount of reward was worth what he was

62

risking, but that says nothing about whether he believed the scheme was legitimate. In fact, the more of his own money Alcindor invested in the undertaking, the more motive he had to engage in any action necessary to prevent losing it.

In any event, even if the court should have permitted Alcindor to introduce that evidence, we are convinced that he was not prejudiced by its exclusion. Alcindor's brothers were allowed to testify that they had to wire him money after he had expended his savings, retirement, and 401(k) funds on the Cascade project, and Alcindor made arguments based on that testimony in his closing.

### E.  Powers' <u>Brady</u> Claim

Powers contends that the government improperly withheld evidence in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194 (1963). The evidence in question is an e-mail addressed to Rector from a sender Powers identified as "Sanski." Powers claims that name was being used by Alex Rybinski, who is the brother of Wayne Rybinski, a straw buyer. The e-mail, dated August 15, 2001, to Rector from "Sanski" stated:

> I need to know if you can lend my brother $15,000.00?  he is willing to pay another $1,500.00. Powers sent him papers for seven units. E-mail or call.  thanks for your time.  A.W.

63

Powers claims that the e-mail was favorable to his defense because Wayne Rybinkski testified during trial that Powers had directed him to contact Rector in order to request a short-term loan that would inflate Rybinski's bank account so that he would have enough of a balance in it to qualify for a loan in a straw transaction. Powers argues that the e-mail contradicts that testimony. When viewed in the context of other evidence introduced at trial regarding the Rybinski straw transactions, however, the e-mail is consistent with the testimony of Wayne Rybinski.

The evidence showed that Rybinski engaged in multiple transactions to purchase condominiums, each of which required him to have $15,000 in his bank account in order to acquire the loans necessary to complete the purchases. In May 2001, in order to complete the first transaction Rybinski combined some of his own money with money he had borrowed from family members. Rybinski testified that after that transaction and before his next set of purchases, Powers had again informed him that he would need a balance of $15,000 in the bank. Because Rybinksi did not have the funds, Powers instructed him to call Rector. Bank records show a $15,000 wire transfer from Rector to Rybinski on August 2, 2001. Rybinski testified that Rector called him after the first wire transfer to tell him that the loan transactions were not ready, and as a result, Rybinski returned the money

by wire transfer on August 6. Bank records also show a second $15,000 wire transfer from Rector to Rybinski on August 20, which was after the loans were ready to be completed, and they show that Rybinski returned the money to Rector by wire transfer on August 23.

The email in question was dated August 15, which was after the first set of wire transfers but before the second. That is consistent with the statement in the e-mail that "he is willing to pay <u>another</u> $1,500.00." Because of its timing the e-mail does not contradict Rybinski's testimony that he contacted Rector to request a loan at the suggestion of Powers. Powers' <u>Brady</u> claim focuses on Rybinski's testimony about his request for a loan from Rector that generated the first set of wire transfers. Those were completed before the email in question was sent on August 15. The e-mail referred to the second set of wire transfers.

Because the e-mail was not inconsistent with Rybinski's testimony, it could not have been used to impeach his testimony against Powers. For that reason evidence of it was neither favorable to Powers nor material to the result of the trial. There was no <u>Brady</u> violation. <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 290, 119 S.Ct. 1936, 1952 (1999); <u>Allen v. Sec'y, Florida Dept. of Corr.</u>, 611 F.3d 740, 745–46 (11th Cir. 2010); <u>Hammond v. Hall</u>, 586 F.3d 1289, 1305 (11th Cir. 2009).

## VI.  <u>Miscellaneous Trial Issues</u>

## A. Antagonism Toward the Defendants

Van Mersbergen contends that the district court abused its discretion and violated his Fifth and Sixth Amendment rights in the manner in which the court conducted the trial, specifically by making critical and "harsh" statements to some of the defense counsel at trial.[18]  Out of the nineteen exchanges between the court and defense counsel that are cited by Van Mersbergen, however, two occurred at pretrial conferences, eleven occurred during the trial but outside the presence of the jury, and only six occurred within the presence of the jury.  "Because a clear effect on the jury is required to reverse for comment by the trial judge," we will only consider the trial court's comments that were made in the presence of the jury.  United States v. Palma, 511 F.3d 1311, 1317 (11th Cir. 2008) (quotation marks omitted).

A trial court is required to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence" in order to ensure that evidence is presented effectively for the ascertainment of truth, time is conserved, and witnesseses are protected from harassment.  See Fed. R. Evid. 611(a).  "The discharge of this responsibility necessarily entails the exercise of discretion."

---

[18] Brown, Hill, Farmer, and Powers adopt this argument.  David Thomas attempts to do so but cannot because he waived his right to appeal his conviction.  See supra, n.11.

66

Haney v. Mizell Mem'l Hosp., 744 F.2d 1467,1477 (11th Cir. 1984). And that discretion is broad.

In conducting a trial, the judge "may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those previously presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion." Moore v. United States, 598 F.2d 439, 442 (5th Cir. 1979)[19] (citations omitted). The trial court abuses its discretion "[o]nly when the judge's conduct strays from neutrality," id., and even then only when its remarks demonstrate "pervasive bias and unfairness" that actually prejudice a party, United States v. Ramirez-Chilel, 289 F.3d 744, 750 n.6 (11th Cir. 2002).

In this case the district court's comments were not derogatory or disparaging, and none of them were about the credibility of witnesses or the substance of any evidence. They were directives to defense counsel aimed at moving things along. There is no likelihood that the statements made in the presence of the jury led it to believe that the judge was biased against any of the defendants. That is especially true given that the judge was evenhanded, directing as many comments and reprimands at the government's attorneys as he did at defense counsel. For example, on more than one occasion the judge scolded the

---

[19] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

government attorneys for presenting cumulative evidence or otherwise delaying the proceedings. The judge also instructed the jury to disregard any of the comments he made to counsel during trial, and we presume the jury followed those instructions. See Stone, 9 F.3d at 938.

Considering the record as a whole, Newman v. A.E. Staley Mfg. Co., 648 F.2d 330, 334–35 (5th Cir. Unit B. 1981), we conclude that "[t]he actions of the trial court challenged here amount to no more than attempts by the presiding judge to expedite the proceedings." United States v. Hill, 496 F.2d 201, 202 (5th Cir. 1974). And when we say that the judge was trying to "expedite" the trial, we mean that he was trying to keep it from bogging down. There were a dozen defendants being jointly tried on a total of 187 counts, involving more than 300 transactions, and more than a dozen attorneys were participating in the trial. As it was, the presentation of evidence alone took 31 trial days, and if the judge had not kept a firm hand on the wheel, the trial might have skidded off the road; the journey to judgment certainly would have taken much longer than it did. Even if the judge was understandably a little impatient at times, we have explained before that "an occasional lapse of patience from the bench will not suffice to overturn a conviction returned after a full and fair presentation of the evidence." Id. There was no rush to judgment.

## B. The District Court's Encouragement to Stipulate

Nor were any of the defendants railroaded. Van Mersbergen contends that he was, arguing that he was deprived of due process because the district court threatened to punish the defendants at sentencing if they refused to agree to reasonable stipulations in order to expedite the trial proceedings.[20] Van Mersbergen focuses on this comment by the district court:

> The Court: Well, the failure to agree to reasonable and usual stipulations is not technically an obstruction of justice but it's certainly a factor that I can consider in future proceedings, if there are any in this case. Who wouldn't agree to the stipulations?
>
> Ms. Nelan: I believe it was Mr. Farmer. . . .

Farmer agreed to some stipulations but not to others. He stipulated to the authenticity of several checks and to the testimony of several borrowers; he declined to stipulate to the testimony of officials from the defrauded lenders.

We have stated that "[f]ederal law places no limitation on the information which a court can consider in determining an appropriate sentence." United States v. Rodriguez, 765 F.2d 1546, 1554–55 (11th Cir. 1985) (citing 18 U.S.C. § 3661 (originally enacted as 18 U.S.C. § 3577)). To the same effect is 18 U.S.C. § 3661, which provides: "No limitation shall be placed on the information concerning the

---

[20] Brown, Hill, Farmer, and Powers adopt this argument. David Thomas attempts to do so but cannot because he waived his right to appeal his conviction. See supra, n.11.

background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

We have recognized, however, that in spite of § 3661's broad language, a "sentencing court cannot consider against a defendant any constitutionally protected conduct." United States v. Rodriguez, 959 F.2d 193, 197 (11th Cir. 1992) (quotation marks omitted); see also U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.") (emphasis added); United States v. Burgos, 276 F.3d 1284, 1291–92 (11th Cir. 2001). If one considers a criminal defendant's failure to stipulate to be the exercise of a constitutional right, it would seem that increasing a defendant's sentence because of his failure to stipulate crosses the line. But some of the lines in this area are blurry.

In United States v. Malekzadeh, 855 F.2d 1492 (11th Cir. 1988), the defendant argued that she had been punished for exercising her constitutional right not to testify because the sentencing court gave her a longer sentence as a result of her refusal to testify against the man she considered her husband. Id. at 1498.

70

Because it was a joint trial, id. at 1494, the defendant would have had to plead guilty in order to testify against the man who was her co-defendant. We did not dispute what she claimed had happened, but we rejected her argument on the ground that "a court is absolutely entitled to consider a defendant's failure to cooperate." Id. We cited for that proposition Roberts v. United States, 445 U.S. 552, 100 S.Ct. 1358 (1980). In Roberts the Supreme Court held that a court could lengthen a defendant's term of imprisonment by imposing consecutive instead of concurrent sentences because he had refused to cooperate in the investigation of another crime in which he was a confessed participant. We interpreted the Roberts decision as being based on the sentencing court's need "to reward those who had cooperated and to encourage those who might cooperate in the future." Malekzadeh, 855 F.2d at 1498. That those who fail to cooperate receive longer sentences than those who are equally culpable but do cooperate is an inevitable product of encouraging cooperation.

That principle is written throughout our criminal law. For example, the Supreme Court has held that it is entirely permissible for prosecutors to threaten a defendant with a harsher charge carrying a much longer sentence in order to pressure him into pleading guilty, and then carry through with the threat when the defendant has the temerity to insist on his constitutional right to trial.

71

Bordenkircher v. Hayes, 434 U.S. 357, 98 S.Ct. 663 (1978).  And the sentencing guidelines reward those who accept responsibility, the chief indicia of which is that they helped the prosecution get the case to the sentence stage more efficiently by pleading guilty.  See U.S.S.G. § 3E1.1.

A distinction might be drawn between the carrot and the stick, between rewarding a defendant for giving up rights to which he is entitled on one hand, and punishing him for refusing to give up those rights on the other.  The argument against that distinction is that the result for the defendant is the same.  If a defendant receives a sentence of 100 months because he went to trial while his equally culpable co-defendant gets 50 months because he cooperated by pleading guilty, is a stick being administered to the defendant or a carrot being given to the co-defendant?

Whatever may be said about the use of sticks, the law seems to be clear that he who receives a break has gotten a carrot, and there is nothing wrong with doling them out.  And that is enough to decide this case.  At trial, the district court sometimes expressed its sentiment regarding stipulations by indicating that cooperation would result in a lower sentence, and at other times by indicating that failure to cooperate would result in a higher one.  At sentencing, however, there were only carrots — cooperation was rewarded all around.  The court specifically

72

told Hill, Powers, Van Mersbergen, Thomas, and Farmer that each of them received lower sentences than they otherwise would have because each had agreed to reasonable and appropriate stipulations during the trial.

Van Mersbergen insinuates that prejudice nevertheless resulted because the court did in fact punish Farmer for his refusal to enter into some of the stipulations, see supra at 72, as evidenced by the disparity between Farmer's sentence (127 months) and Brown's (5 months).[21] The record, however, reflects that the district court explicitly stated that it sentenced Farmer towards the low end of his guidelines range (121–151 months) because he had entered into reasonable stipulations that shortened the trial, which reduced the costs to the government in time and money. The court did not intimate that it was imposing a longer sentence because Farmer had not entered into some of the other stipulations.

The government also points out that Farmer deserved a much longer sentence than Brown because he participated in far more transactions than she did. The court adequately explained its reasons for both sentences, and those reasons did not involve a difference in the number of stipulations the two defendants entered into. The reasons the court gave for Farmer's sentence (which was, as we have mentioned, near the bottom of the guidelines range) included the magnitude

---

[21]Of course, Van Mersbergen has no standing to complain about what happened to Farmer, but his argument on this issue has been adopted by Farmer, so we will consider the argument as though it were in Farmer's own brief.

73

of the crime, the loss involved, and Farmer's lack of remorse. As for Brown, the court explained that it was sentencing her to only five months when the guidelines recommended a sentence between 63 and 78 months because of "her extraordinary lack of profit" and because the amount of loss grossly overstated her criminal conduct compared to that of the other defendants. Those are reasonable bases for the difference in sentences imposed on Farmer and Brown.

## C. Powers' Contentions

Powers contends that the district court abused its discretion in various rulings on his objections and motions relating to evidentiary matters. First, Powers contends that the court abused its discretion in preventing him from attacking the credibility of one of the government's witnesses. Elizabeth Rusciano, a straw borrower, had testified that she applied for loans using Powers and Wayne Jenkins as her loan officers on separate occasions but that she was completely unaware that the applications they filled out for her contained fraudulent information. During his cross-examination of Wayne Jenkins, Powers' counsel sought to elicit testimony that in reality Rusciano was complicit in concocting the fraudulent lease used in the loan she obtained through Jenkins. The district court cut short this line of questioning, explaining that it was "remote," "inconsequential," and a "needless expenditure of time" because

whether or not Rusciano had conspired with Jenkins was irrelevant to whether Powers had prepared fraudulent loan applications for her. That was not an abuse of discretion.

Powers also argues that the court's comments when ruling on that matter so prejudiced him that the court should have granted a mistrial. Even improper comments by a judge warrant reversal only if they had such a prejudicial effect on the jury that they denied the defendant a fair trial. United States v. Tampas, 493 F.3d 1291, 1303 (11th Cir. 2007). The comments that Powers complains about could not have had any effect on the jury because they were made outside its presence. Although the court did ask Powers' attorney in the presence of the jury about the relevance of his line of questioning, that was an entirely proper question and could not have unfairly prejudiced the jury. See Tampas, 493 F.3d at 1303 ("[T]he brief question to defense counsel in the context of an evidentiary objection had no clear effect on the jury."). And, as we have mentioned before, the court instructed the jury to disregard any comments by it or the attorneys.

Powers also contends that he was prejudiced by three statements or comments one of the prosecutors made at the trial: a question about Powers being terminated from his job at First Realty Mortgage; the prosecutor's statement to the court about a question she wanted to ask a witness about Powers' income; and the

prosecutor's mention of evidence related to a dismissed count during closing arguments. "Prosecutorial misconduct requires a new trial only if we find the remarks (1) were improper and (2) prejudiced the defendant's substantive rights. In order to assess the prejudicial impact of a prosecutor's statements, we must evaluate them in the context of the trial as a whole and assess their probable impact on the jury." United States v. Hernandez, 145 F.3d 1433, 1438 (11th Cir. 1998). For a prosecutor's prejudicial comments to affect a defendant's substantial rights, there must be a reasonable probability that, but for the remarks, the outcome would have been different. United States v. Hall, 47 F.3d 1091, 1098 (11th Cir. 1995).

Considering the pile of evidence proving the prosecutor's case against Powers, even if we were to assume that her remarks or questions were improper, Powers has not demonstrated that his substantial rights were prejudiced, particularly in light of the court's instructions to the jury to disregard any comments made by the attorneys during the trial. See Hall, 47 F.3d at 1098.

Finally, Powers contends that the district court erred by denying his motion for a mistrial based on the prosecutor's reference to evidence about Count 33, a charge that had already been dismissed (on the government's motion because it

listed the wrong lender). Powers failed to object to the prosecutor's statement, and that statement did not rise (or sink) to the level of plain error.[22]

## VII. Jury Instruction Issues

Brown, Farmer, Hill, and Van Mersbergen challenge the district court's refusal to give some of their requested jury instructions.[23] Hill asked for one about good faith reliance on the advice of counsel as a defense, which the district court rejected on the basis that there was insufficient evidence to support it. All of the defendants requested a general instruction on good faith. The government did not oppose one, except as to the 18 U.S.C. § 1014 false credit application charges; it asked that the good faith instruction be modified so that it did not apply to the § 1014 charges. The government also asked that the good faith instruction include a caveat to the effect that ignorance of the law was not a defense. The court granted the government's requests and issued a modified good faith instruction that included the so-called "ignorance of the law" instruction.

---

[22]Powers also contends that even if no single ruling or occurrence about which he complains deprived him of a fair trial, the cumulative effect of all of them did. See United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005). We disagree. Powers may not have gotten a perfect trial, but he was not entitled to one. See United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("A defendant is entitled to a fair trial but not a perfect one.") (quotation marks omitted). He did receive a fair trial.

[23]David Thomas also makes this argument, but we cannot consider it as to him because he waived his right to appeal his conviction. See supra, n.11.

77

The court also granted, over the defendants' objections, the government's request for an instruction regarding deliberate ignorance. Brown and Powers argue that was error. The court denied as argumentative Powers' request for a theory of defense charge, and he argues that was error.

While we review de novo issues about whether the content of instructions that were given are correct statements of law, United States v. Chandler, 996 F.2d 1073, 1085 (11th Cir. 1993), we review only for an abuse of discretion a district court's refusal to give a requested jury instruction. See United States v. Sirang, 70 F.3d 588, 593 (11th Cir. 1995). We will reverse a district court's refusal to give an instruction only if: "(1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." United States v. Jordan, 582 F.3d 1239, 1247–48 (11th Cir. 2009); see also Sirang, 70 F.3d at 593.

A. Hill's Proposed Instruction about Good Faith Reliance on Advice of Counsel

Hill argues that because he used attorneys for most of the fraudulent transactions and closings, he was entitled to rely on their implied advice that what

78

he was doing was legal.[24] He requested that the jury be instructed that good faith reliance on his counsel's advice was a complete defense to the charges against him. The government opposed the instruction on the ground that it would be misleading because Hill's attorneys were also co-conspirators. The district court denied Hill's request, finding that there was insufficient evidence to support the instruction because there had been no testimony that any of the defendants actually did rely on advice of counsel. In denying Hill's post-trial motion for acquittal, the district court reiterated that there was no evidence to support the instruction. It added that the fraud was obvious from the face of the documents and that the attorneys who testified about the residential mortgage fraud scheme were admitted co-conspirators.

In order to qualify for an instruction on good faith reliance on the advice of counsel, a defendant must show that (1) he fully disclosed to his attorney all material facts that are relevant to the advice for which he consulted the attorney; and (2) thereafter, he relied in good faith on advice given by his attorney. See United States v. Miles, 290 F.3d 1341, 1354 (11th Cir. 2002); United States v. Condon, 132 F.3d 653, 656 (11th Cir. 1998); United States v. Johnson, 730 F.2d 683, 686 (11th Cir. 1984).

---

[24] Brown, Farmer, and Van Mersbergen adopt this argument. David Thomas attempts to do so but cannot because he waived his right to appeal his conviction. See supra, n.11.

Although the burden on a defendant to put forth sufficient evidence to support a proposed jury instruction is low, United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995), Hill failed to meet it because there was no evidence to support the instruction. Hill points out that attorneys were used by many of his "investors" as well as by the lenders, and he was personally represented by at least five different attorneys over the course of the events. At no point, however, did any of the attorneys advise Hill that the overall scheme or all of its essential components were legal.

Hill argues that he relied on the advice of attorneys Dewrell and Sacks with respect to Counts 1–14, which charged him with the line of credit fraud on Charter Bank. Both of those attorneys testified, but they did not say that they had represented Hill in his dealings with Charter, or that they had reviewed and advised Hill about the false statements on the credit applications, the false statements on Hill's and Graham's financial statements, or the false statements that Hill made to Hungerford, a vice president of Charter Bank who had requested assurances that Hill's lines of credit were sufficiently secured.

Attorneys Dewrell and Sacks did testify that they advised Hill concerning the formation and business of Atlanta Condo and Atlanta Millenium (the Hill-controlled entities involved in the Charter Bank fraud), and that they advised him

about his personal transactions with Vargas (his co-conspirator at Charter who helped him get the lines of credit). Those transactions were not, however, the basis of the fraud charges. Hill has not pointed to a single piece of evidence indicating that he fully disclosed to any attorney the material facts relevant to his obtaining the lines of credit from Charter Bank, or any evidence indicating that any attorney advised him that his fraudulent representations to Charter were legal. So, no advice of counsel instruction was warranted on Counts 1–14.

Hill also argues that he relied upon the advice of his co-conspirator attorneys Halcomb and Wolf with respect to Counts 19–187, charging him with the multi-property mortgage fraud. Halcomb and Wolf both testified, however, that at no time did they believe that Hill had come to them for advice, and they specifically denied ever giving him an opinion as to the legality of those transactions. Given the lack of evidence to support an advice of counsel instruction, the district court's refusal to give one was not an abuse of discretion.[25]

B. The Good Faith Instruction That Was Given

According to Hill, the court's instruction on good faith as a defense was erroneous because it did not cover the false credit application counts, and because

_____

[25] We need not reach the government's alternative arguments that the instruction was properly refused because the fraud was obvious and therefore the reliance could not have been in good faith, or that a defendant may not claim good faith reliance on advice of counsel where the counsel was a co-conspirator who participated in the fraud.

81

its effect was not strong enough to survive the government's closing argument that "ignorance of the law is not a defense."[26]  We reject both of those arguments.

### 1.  Refusal to Instruct on Good Faith as to the Section 1014 Charges

Hill asked the court to give the pattern jury instruction on good faith as a defense to all of the charges in the indictment.  The court gave that instruction as to all of the fraud charges in the indictment, except the § 1014 false credit application charges.  At the government's request, the court left those charges out of the scope of the good faith instruction.  This is what the court told the jury about good faith as a defense:

> Ladies and gentlemen, <u>good faith is a complete defense to the bank, wire and mail fraud charges in the indictment</u> since good faith on the part of the defendant is inconsistent with intent to defraud or willfulness, which is an essential part of such charges.

> The burden of proof is not on the defendant to prove good faith, of course, since the defendant has no burden to prove anything. The government must establish beyond a reasonable doubt that the defendant acted with specific intent to defraud as charged in the indictment.

> One who expresses an honestly held opinion or an honestly formed belief is not chargeable with fraudulent intent even though the opinion is erroneous or the belief is mistaken; and, similarly, evidence

---

[26] Brown also makes these same arguments about the good faith jury instruction, while Farmer, Laudermill, Powers, and Van Mersbergen adopt Hill's arguments on it. David Thomas attempts to do so but cannot because he waived his right to appeal his conviction. <u>See</u> <u>supra</u>, n.11.

which establishes only that a person made a mistake in judgment or an error in management or was careless does not establish fraudulent intent.

On the other hand, an honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed would not in and of itself constitute good faith as that term is used in these instructions if in carrying out that venture the defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.

(emphasis added). Hill's complaint, as we said, is not with the content of the good faith instruction as to the "bank, wire and mail fraud charges in the indictment," but with the failure to instruct the jury that good faith is also a complete defense to the § 1014 credit application fraud charges. We assume for present purposes that good faith is a defense to those charges, which would mean that "the requested instruction was a correct statement of the law," the first requirement for finding an abuse of discretion based on a refusal to give a requested instruction. Jordan, 582 F.3d at 1247.

That assumption without more does not, however, establish that the refusal to give the good faith instruction as to the § 1014 charges was an abuse of discretion. As we have explained, the "failure to give the proffered instruction on good faith is not per se error [because] we must examine the facts of the case to determine the adequacy of the instructions as a whole and the effect of the omission on the defendant's case." Sirang, 70 F.3d at 594. To move the analysis

83

along, we will assume that there was an evidentiary basis for the good faith instruction on the § 1014 charge insofar as Hill (and the other defendants who are pursuing this issue) are concerned. Still, in order to prevail, the defendants must establish that the subject matter of the requested instruction "was not substantially covered by other instructions," and that it "dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." Jordan, 582 F.3d at 1247–48. That is where their position falters.

The good faith defense for the § 1014 crime was substantially dealt with in the instructions on the elements of the crime and on the definitions of the required state of mind. This is what the court instructed the jury about the elements of the § 1014 crime:

> Now, ladies and gentlemen, Title 18, United States Code Section 1014 makes it a federal crime or offense for anyone to willfully make a false statement to a federally insured financial institution.

> The defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt: First, that the defendant knowingly made a false statement or report to the financial institution described in the indictment; second, that the deposits of the institution were insured by the Federal Deposit Insurance Corporation; and, third, that the defendant made the false statement or report willfully and with intent to influence the action of the institution upon an application, advance, commitment or loan or any change or extension thereof.

84

A statement or report is false when made if it is untrue and is then known to be untrue by the person making it.

It is not necessary, however, to prove that the institution involved was, in fact, influenced or misled. <u>The gist of the offense is an attempt to influence such an institution by willfully making a false statement or report</u> concerning the matter.

(emphasis added). <u>See</u> Eleventh Circuit Pattern Jury Instructions (Criminal) at 232–33, Offense Instruction 39 (West 2003).

The definitions the court gave the jury on the key mental state terms were these:

The word "knowingly," as that term is used in the indictment or in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

The word "<u>willfully</u>," as that term is used in the indictment or in these instructions, <u>means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids, that is, with bad purpose either to disobey or disregard the law</u>.

While you must find that the defendants acted willfully as I have just instructed you, willfulness does not require that the defendants specifically know that the conduct alleged in the indictment constitutes a <u>criminal</u> violation or specifically know which federal or state criminal—excuse me, which federal or state criminal prohibition such conduct may violate.

(emphasis added).

The closest precedent on this issue is <u>United States v. Martinelli</u>, 454 F.3d 1300 (11th Cir. 2006), where we found no reversible error under similar

85

circumstances. The district court in that case refused to give the defendant's proffered instruction on good faith as a defense to the charge of conspiracy to launder money. The court did, however, instruct the jury that the defendant "had to know the money represented the proceeds of the specified unlawful activity of mail fraud." Id. at 1315. The instructions also properly defined the term "knowingly" so that "the jury plainly had to rule out the possibility that [the defendant] actually harbored a good-faith belief in the legitimacy of the business before it could have found that he knew the money represented proceeds of mail fraud." Id. at 1316. "In other words, based on the instructions the district judge gave, if the jury concluded that [the defendant] had a good-faith belief in the legitimacy of the business, it could not have found that he knew the funds were the proceeds of mail fraud." Id.

The same reasoning applies in this case. The court instructed the jury that the defendants had to have made the false statements wilfully and with intent to influence the lenders. The instructions properly defined "wilfully" so that the jury plainly had to rule out the possibility that the defendants actually harbored a good faith belief in the legitimacy of the scheme before the jury could have found that they made the false statements wilfully and with the intent to influence the lenders. See Sirang, 70 F.3d at 595 ("As we have said, the finding of specific intent to

86

deceive categorically excludes a finding of good faith.")  In other words, based on the instructions the district judge gave, if the jury had concluded that the defendants had a good faith belief in the legitimacy of the scheme, it could not have found that they made the false statements wilfully and with the intent to influence the lenders.  The Martinelli decision and common sense compel that conclusion.

It follows that the instruction on good faith as a defense to the § 1014 charge was "substantially covered by other instructions," Jordan, 582 F.3d at 1247, so that there was no abuse of discretion in failing to give it, although we note, as the Martinelli opinion did, that "it would have been wiser to instruct on the defense of good faith."  Martinelli, 454 F.3d at 1317.

### 2.  "Ignorance of the Law Is Not a Defense"

In addition to modifying the good faith instruction to exclude the false credit application charges, the district court granted the government's request to include an additional instruction to the effect that ignorance of the law is not a defense, although the instructions did not use those words.  The language added to the instructions at the government's request stated that:

> While you must find that the defendants acted willfully as I have just instructed you, willfulness does not require that the defendants specifically know that the conduct alleged in the indictment constitutes a criminal violation or specifically know which federal or state

87

criminal—excuse me, which federal or state criminal prohibition such conduct may violate.

At closing, the government paraphrased this language by arguing to the jury that "ignorance of the law is not a defense." After Hill argued in closing that he had relied in good faith on the advice of his attorneys, the government responded by urging the jury to "remember, ignorance of the law is not a defense."

A court's improper jury instruction necessitates reversal only if we are left with "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." United States v. Beasley, 72 F.3d 1518, 1525 (11th Cir. 1996). We are not convinced that, viewing the charges as a whole, the jury was confused or misguided by the court's inclusion of the ignorance of the law instruction. See Everett v. Carnival Cruise Lines, 912 F.2d 1355, 1358 (11th Cir. 1990). The jury was correctly instructed as to good faith, about the mental states required to sustain a conviction, and that "willfulness does not require that the Defendants specifically know that the conduct alleged in the indictment constitutes a criminal violation." (emphasis added). We find no error in that combination of instructions.

## C. The Deliberate Ignorance Instruction

Powers argues that the district court committed reversible error by instructing the jury on deliberate ignorance when there was no evidentiary basis

88

from which a jury could have found that he was deliberately ignorant of material facts.[27] Even assuming there was no evidence that Powers was deliberately ignorant and for that reason the instruction should not have been given, it was harmless to do so because there was sufficient evidence to prove beyond a reasonable doubt that he had actual knowledge. See United States v. Steed, 548 F.3d 961, 978 (11th Cir. 2008) (declining to address whether the facts at trial supported a deliberate ignorance instruction "because any shortcoming in the evidence about deliberate ignorance was rendered harmless by the sufficiency of the evidence of actual knowledge") (citation and quotation marks omitted); United States v. Kennard, 472 F.3d 851, 858 (11th Cir. 2006) ("[A]ny error in giving an unwarranted deliberate ignorance instruction is harmless if the jury could have convicted on an alternative, sufficiently supported theory of actual knowledge."); United States v. Stone, 9 F.3d 934, 937–41 (11th Cir. 1993) (same).[28]

_____

[27] Brown also raises this issue in her brief, while Farmer, Hill, and Van Mersbergen adopt it. (David Thomas attempts to adopt it but cannot because he waived his right to appeal his conviction. See supra, n.11.) For the sake of simplicity and because Brown makes substantially the same arguments as Powers, we will refer to this as Powers' argument. The same principles and result apply to the other defendants because for each of them there was evidence of actual knowledge, making any error in giving the instruction on deliberate ignorance harmless.

[28] We also note that there was some evidence in the record to support the district court's deliberate ignorance instruction. John Hain, Powers' supervisor at First Realty Mortgage, indicated to Andrew Wolf, one of Hill's closing attorneys, that if asked he would deny that he had knowledge that straw buyers had not supplied the down payments at their closings. Wolf testified that in order to "cover [his] butt," he and Hain exchanged drafts of a memo that was designed to make it explicit that Hain did know about the falsified down payments. Wolf also testified that, while he may not have faxed Powers a copy of the e-mail, he did have discussions with Powers at First Realty Mortgage. Combined with the evidence of Powers' involvement, the

## D. Brown's Theory of Defense Instruction

Brown argues that the district court erred in declining to give an instruction on her theory of defense that she, as a new appraiser, relied in good faith on her employer's supervision and guidance. Because Brown did not request such an instruction or object to the failure to give one, our review is only for plain error. Sirang, 70 F.3d at 594. There is no plain error for several reasons, including the fact that the point of law was substantially covered by the general good faith instruction that the court did give.

## E. Powers' Theory of Defense Instruction

Unlike Brown, Powers did request a specific theory of defense charge. The district court correctly concluded, however, that the requested instruction should not be given because it was less a theory of defense than an argument that Powers should be acquitted. See United States v. Paradies, 98 F.3d 1266, 1287 (11th Cir. 1996) (holding that the district court correctly refused a requested instruction that contained the defendants' "partisan" argument and proposed factual findings). The non-argumentative parts of Powers' proffered instruction were adequately covered by the instruction that the court did give on good faith.

## VIII. Sufficiency of the Evidence

jury was presented with sufficient evidence from which it could have concluded that Powers remained willfully ignorant of the fraudulent misrepresentations, just as his supervisor had attempted to do.

90

Hill, Alcindor, Brown, Farmer, Laudermill, Powers, and Van Mersbergen challenge the sufficiency of the evidence presented at trial. We review the issues de novo, and "we will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." United States v. Silvestri, 409 F.3d 1311, 1327 (11th Cir. 2005) (quotation marks omitted). In reviewing the sufficiency of the evidence, "we look at the record in the light most favorable to the verdict" and draw all reasonable inferences and resolve all questions of credibility in its favor. United States v. Marte, 356 F.3d 1336, 1344 (11th Cir. 2004).

## A. Farmer

Farmer contends that we must vacate his convictions for money laundering and his conviction for conspiracy, which included allegations of money laundering as overt acts performed in furtherance of the conspiracy.[29] He relies on United States v. Santos, 553 U.S. 507, 128 S.Ct. 2020 (2008), in which the Supreme Court held that laundering of the "receipts" of an illegal gambling operation — as opposed to the "profits" — did not constitute money laundering. Farmer argues that Santos applies to this case because there was no proof that the "proceeds" alleged and proven were "profits" and not simply gross receipts or expenses of the

---

[29] Hill, Alcindor, Brown, Laudermill, Van Mersbergen and Powers have adopted Farmer's argument regarding the money laundering charges.

91

fraudulent scheme. The government argues that we should review this contention only for plain error because Farmer failed to raise it properly in the district court.

Under any standard of review, Farmer's contention is foreclosed by our decision in United States v. Jennings, 599 F.3d 1241 (11th Cir. 2010). In that decision we refused to extend the rationale of Santos to cases involving mail or wire fraud due to the "limited precedential value," id. at 1252 (quoting United States v. Demarest, 570 F.3d 1232, 1242 (11th Cir. 2009)), of Justice Stevens' plurality opinion in Santos, which we treat "as controlling in its narrowest form." Id. In light of Jennings, we reject Farmer's Santos-based contention that we should vacate his convictions for money laundering in connection with mortgage fraud.

## B. Hill

Hill contends that the government did not present sufficient evidence to sustain his convictions for bank fraud (Counts 3–4) and false credit applications (Counts 5–8) in relation to the fraud on Charter Bank. He also challenges the sufficiency of the evidence supporting his convictions for mail fraud (Counts 35, 36, and 38).

### 1. Hill's Convictions for Bank Fraud and False Credit Applications

To prove bank fraud under 18 U.S.C. § 1344, the government must show that: (1) a scheme existed to obtain money, funds, or credit in the custody or control of a federally insured financial institution; (2) the defendant participated in the scheme by means of material false pretenses, representations, or promises; and (3) the defendant acted knowingly. United States v. Williams, 390 F.3d 1319, 1324 (11th Cir. 2004). To prove that a defendant filed a false credit application under 18 U.S.C. § 1014 the government must show that: (1) the defendant knowingly made a false statement or report; and (2) he did so for the purpose of influencing the conduct of a federally-insured bank with respect to an application, advance, commitment, or loan. United States v. Thorn, 17 F.3d 325, 327 (11th Cir. 1994).

The evidence showed that in order to obtain two lines of credit from Charter, Hill and his associates submitted applications in the name of two Hill-owned entitites, Atlanta Condo and Storage, Inc., and Atlanta Millenium Investments, L.L.C. Hill represented to Charter that Christopher Graham, his employee who performed maintenance and furniture moving services, owned a 25 percent stake in Atlanta Condo (valued at $180,000) and also $20,000 in furnishings. Hill's own financial statement indicated that he was receiving an income of $20,000 per week from Atlanta Condo and that his ownership interest

93

was worth $570,000. In reality, Graham's name was listed on the Atlanta Condo application in order to obscure Hill's involvement from disgruntled residents. And Atlanta Condo was not worth $750,000, as Hill had represented. The company had no accounts receivable, it had conducted no business, and according to Hill's tax returns, it was valued at only $90,000.

The evidence also showed that Hill presented Charter with a shareholder agreement between himself and Graham that was dated Ocotober 6, 2001, but Graham testified that he did not know Hill in 2001 and he did not move to the address listed as his residence on the application until March of 2002. Finally, Hill represented to Charter that the line of credit would be used for working capital. Instead, Hill used the money to buy things for himself and for his daughter and to pay for expenses associated with his personal residence.

There was also sufficient evidence to sustain Hill's convictions for bank fraud and false credit applications regarding the Atlanta Millenium line of credit (Counts 4 and 6). The evidence showed that Hill again represented to Charter that the funds would be used for working capital, but he and Vargas, his co-conspirator and inside man at Charter, knew at the time that the loan would be used to fight a temporary restraining order that resulted from litigation over Hill's sale of some condominiums (Counts 19–187). Also like the Atlanta Condo transaction, Hill

94

offered a security interest in Atlanta Millenium's assets even though the company had conducted no business and had no accounts receivable. Even if Charter would have had an interest in any future accounts receivable, as Hill now argues, the evidence still showed that the application was fraudulent because of Hill's representations to Charter, which he knew to be false.

The evidence showed that Hill's fraud on Charter continued even after Vargas was asked to resign once his involvement in several suspicious transactions came to light. When Charter discovered that Hill was connected to the Atlanta Condo and Atlanta Millenium transactions, Hill met with Hungerford, a Charter Bank Vice President, to discuss the prospects of repayment. In that meeting, Hill reaffirmed that the Atlanta Condo line of credit was secured by the accounts receivable, which Hill knew did not exist, and he further represented that the Atlanta Millenium line of credit was secured by a $400,000 note from "Alcindor Williams," which he expected to be paid in two weeks. Hill concealed the fact that the Alcindor-Williams Group had already filed for bankruptcy and that there was no real hope that the note would be paid any time soon, if ever.

The evidence showed that Hill later sent a fax to Hungerford indicating that the lines of credit were also secured by a primary mortgage on Lot 33 of the Cascade subdivision as well as secondary liens on 28 homesites. He concealed the

95

fact that Lot 33 had already been conveyed to the Alcindor-Williams Group, which had contracted to build a house on the land (an obligation that was never performed). Hill also failed to disclose that a secondary lien on any of the 28 homesites was worthless because Centrum was foreclosing on its primary lien that was valued at $1.2 million.

The government produced enough evidence at trial from which a reasonable factfinder could conclude beyond a reasonable doubt that many material misrepresentations Hill made to Charter Bank were fraudulent. His insufficiency of the evidence contentions are all meritless.

### 2. Hill's Convictions for Mail Fraud

Hill also contends that his convictions for mail fraud and conspiracy to commit mail fraud (Counts 19, 35, 36, and 38) should be reversed because the government failed to prove that the mails were used in furtherance of his scheme to defraud. "Mail fraud consists of the following elements: (1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails in furtherance of the scheme." United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (quotation marks omitted).

The only mailings alleged by the indictment were of the file-stamped copies of transfer deeds and lien documents by the county clerk's office that were mailed

96

to the closing attorneys who then saw that the lenders got copies. Hill argues that those mailings were not done in furtherance of his scheme to defraud because they did not occur until the scheme had already succeeded. The government has conceded that the mailings by the clerk's office were not sufficiently essential to the fraudulent scheme unless they were necessary to lull the lenders into believing that the fraudulent transactions were actually legitimate.

In order to fall within the scope of 18 U.S.C. § 1341, a mailing must constitute part of the execution of the fraud. United States v. Evans, 473 F.3d 1115, 1118–19 (11th Cir. 2006). "To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme or a step in [the] plot." Schmuck v. United States, 489 U.S. 705, 710–11, 109 S.Ct. 1443, 1447–48 (1989) (citations and quotation marks omitted). There does come a point at which a mailing will no longer be considered part of the execution of a fraudulent scheme. After a scheme has "reached fruition" mailings generally cannot have been "'for the purpose of executing' the scheme," as 18 U.S.C. § 1341 requires. United States v. Georgalis, 631 F.2d 1199, 1204 (5th Cir. 1980); see also United States v. Adkinson, 158 F.3d 1147, 1163 (11th Cir. 1998) ("We have not hesitated to reverse mail fraud convictions where the underlying scheme has

97

reached fruition prior to the mailing."). But there is a lulling exception to that rule.

Under the lulling exception, mailings are sufficiently a part of the execution of a fraudulent scheme if they are used to lull the scheme's victims into a false sense of security that they are not being defrauded, thereby allowing the scheme to go undetected. Georgalis, 631 F.2d at 1204. And a lulling mailing may be "incident to an essential part of the scheme" even after the fraud has been successfully perpetrated if the mailing is critical to conceal the scheme. For example, in Schmuck, a used car distributor sold cars to dealers at inflated prices after he rolled back the odometers. 489 U.S. at 707, 109 S.Ct. at 1446. Then, in order to complete sales to innocent buyers, the dealers mailed title applications to the state motor vehicle agency to transfer title from the dealer to the buyers. Id., 109 S.Ct. at 1446. The Supreme Court upheld Schmuck's conviction for mail fraud based on the mailing of the title applications by the dealers even though Schmuck had already successfully swindled the dealers by the time the mailings were done. Id. at 715, 109 S.Ct. at 1450. The Court concluded that a reasonable juror could have inferred that the continued success of Schmuck's fraudulent scheme was inextricably intertwined with his good relationships with the defrauded dealers, which were in turn dependent on the passage of title from

98

dealer to buyer. Id. at 711–12, 109 S.Ct. at 1448–49. Therefore, even though the mailings did not occur until after Schmuck's own deals were completed and he had the fruits of the fraud in hand, the mailings furthered his scheme to defraud because they were essential to prevent the dealers from discovering that they had been duped. Id., 109 S.Ct. at 1448–49.

Hill argues that, unlike Schmuck, the mailings by the clerk's office in this case were not in furtherance of any scheme to defraud because they were not necessary for him to obtain funds from the lenders or to buy or sell the properties. As the government points out, however, Hill's scheme was ongoing. In order to keep it going, the closing attorneys had to receive file-stamped copies of deeds and lien documents from the clerk's office, and that office used the mail to get those documents to the closing attorneys. The closing attorneys then forwarded the documents in the completed loan packages to the lenders. Otherwise, the lenders would have realized that the straw buyers had no real interest in the property, and the fraud machine would have come to a grinding halt. The mailings of the file-stamped copies of the documents oiled the machinery and kept it running. But for those documents, Hill would not have been able to avoid detection as long as he did, and there would not have been as many fraudulent loans and as much illicit gain.

Because the scheme depended on the observance of normal filing procedures, it was not "fully consummated" before the mailings were sent, even though the loans had already been processed. See United States v. Evans, 473 F.3d 1115, 1120 (11th Cir. 2006). When, as here, "the scheme includes not only obtaining the benefit of the fraud but also delaying detection of the fraud by lulling the victim after the benefit has been obtained, the scheme is not fully consummated, and does not reach fruition, until the lulling portion of the scheme concludes." Id.

Even so, Hill argues that his mail fraud convictions cannot be based on the lulling theory because it was not alleged in the indictment or charged to the jury. It is true that "[t]his Court cannot affirm a criminal conviction based on a theory not contained in the indictment, or not presented to the jury." United States v. Elkins, 885 F.2d 775, 782 (11th Cir. 1989) (citation omitted). However, that simply means that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." Stirone v. United States, 361 U.S. 212, 217, 80 S.Ct. 270, 273 (1960); see also Georgalis, 631 F.2d at 1205 ("A variance between indictment and proof is fatal only when it affects the 'substantial rights' of the defendant by insufficiently notifying him of the charges against him so that he may prepare a proper defense.").

Hill was not convicted of any charges that were not contained in the indictment, nor were his rights violated because the indictment failed to notify him of the charges he faced. It specifically charged that Hill committed mail fraud by, among other things, causing the title and lien documents to be mailed in furtherance of a scheme to defraud lenders.[30]

As for the jury not being instructed on the lulling theory, the Supreme Court has upheld a mail fraud conviction based on that theory even though the jury was not specifically instructed on it. See United States v. Lane, 474 U.S. 438, 452–53, 106 S.Ct. 725, 734 (1986). In Lane, the Court held that "[t]he jury was properly instructed that each charged mailing must have been made both 'for the purpose of

---

[30] The indictment charged that:

> [Hill and his co-conspirators] devise[d] a scheme and artifice to defraud mortgage companies by submitting and causing to be submitted materially false qualifying information and documentation and other fraudulent representations to obtain mortgage loans, causing the Postal Service and other interstate carriers to be used and interstate wire communications to be made in furtherance of said scheme and artifice to defraud, in violation of Title 18, United States Code, Sections 1341 and 1343 ; and . . .

> As part of the closing process of the transactions specified above . . . closing attorneys Christopher Halcomb and Andrew Wolf submitted transfer deeds and lien documents to the appropriate county clerk property recording department with a request that stamped-filed copies of these documents be returned to him. Pursuant to these instructions, such documents were returned to the relevant closing attorney by United States Mail. Halcomb and Wolf also mailed a complete closing package to the lender by United States mail or commerical interstate carrier.

Doc. 702, Third Superseding Indictment, at ¶¶ 21(a), 23(c).

executing the scheme to defraud' and prior to the scheme's completion, and further that mailings 'which facilitate concealment of the scheme' are covered by the statute." Id. (citations and emphasis omitted). That was enough in the Supreme Court's view.

The jury in this case was also instructed on the three components that the Supreme Court identified in Lane as a sufficient basis for the lulling theory: (1) the mailing must have been done "for the purpose of executing the scheme to defraud"; (2) the mailing must have occurred before the scheme was complete; and (3) the statute covers a representation that conceals a material fact.[31] See id.

---

[31] Specifically, the jury in this case was charged, in relevant part, as follows:

> The Defendant can be found guilty of [mail fraud] only if all of the following facts are proved beyond a reasonable doubt: . . . That the Defendant used the United States Postal Service by mailing or by causing to be mailed . . . some matter or thing for the purpose of executing the scheme to defraud[;]

> What must be proved beyond a reasonable doubt is that the Defendant, with the specific intent to defraud, knowingly devised, intended to devise, or participated in, a scheme to defraud substantially the same as the one alleged in the indictment, and that the use of the United States mail was closely related to the scheme because the Defendant either mailed something or caused it to be mailed in an attempt to execute or carry out the scheme[;]

> A statement or representation may also be "false" or "fraudulent" when it constitutes a half truth, or effectively conceals a material fact, provided it is made with intent to defraud.

(emphasis added).

102

Under the Lane decision Hill's contention that the jury was not sufficiently instructed on the lulling theory fails.

The remaining question is whether the government was required to put on evidence that if the lenders had not received file-stamped documents regarding the loans they had made and their security interests, they would have become wise to Hill's scheme and quit dealing with him and his associates. If evidence was required, there was enough of it.

As we discussed earlier, see supra, Part V, Section A, representatives of several lenders — including a representative of Alliance Mortgage, the lender for the loan at issue in Count 35 — testified that their institutions would not have approved the loans if they had known that information in the applications had been falsified. There was a stipulation that if the lenders for the loans at issue in Counts 36 and 38 had known those applications contained false information about owner-occupancy, appraisals, earlier sales, the source of any down payment, the existence of quitclaim deeds, or money paid to the borrower for use of his or her credit, that knowledge would have affected their decisions. An underwriter and attorney for a title insurance company even instructed her closing attorneys to cease closing on any loans involving Hill once she learned of the scheme, and a bank's underwriter added Farmer, Hill, and one of their closing agents to the bank's exclusionary list

after an internal audit uncovered several instances of fraud in loan applications. And one of Hill's closing attorneys testified that a lender's receipt of the closing package, including the deeds that had been filed and mailed back from the clerk's office, was a vital part of the transaction. All of that evidence was more than enough to prove beyond a reasonable doubt that the mailings were an essential part of the overall scheme, that they occurred before the scheme had reached fruition, and that they were necessary to conceal the fraud from the lenders and to keep the scheme going. Hill's convictions for mail fraud and conspiracy to commit mail fraud (Counts 19, 35–36, and 38) are supported by the evidence.

## C. Alcindor

Alcindor contends that there was insufficient evidence to prove that he was guilty of the conspiracy alleged in Count 19, the mail and wire fraud charges alleged in Counts 38 and 46–47, and the money laundering charges alleged in counts 85–90, 94, and 179–180. All of those charges against Alcindor stem from his involvement in transactions with straw buyers Annette Spear, Cheryl Denny, and Cortney Jackson. Alcindor asserts that the government did not produce any evidence implicating him personally in any fraud or money laundering with respect to transactions involving those three straw buyers.

Alcindor concedes that he was part of the Alcindor-Williams group, that two of the three fraudulent sales used to fund the promissory note backing the $400,000 loan from Estates Atlanta involved the Alcindor-Williams Group as seller, and that funds from each of the three transactions were transferred to accounts associated with his group. But he asserts that the only evidence that involved him personally was of a wire transfer to his credit union account as part of the Annette Spear transaction, and he argues that single connection was insufficient to sustain his convictions on any of the counts involving Spear, Denny, and Jackson as straw buyers.

But Alcindor's challenged convictions are also supported by the evidence underlying his convictions stemming from the fraudulent Centrum loan. Alcindor falsely represented to Centrum that the $400,000 equity requirement would be paid by the Alcindor-Williams Group. He then signed an undisclosed $400,000 note that was to be funded in part by the fraudulent sale of three properties in the Cascade subdivision to Annette Spear, Cheryl Denny, and Cortney Jackson. Each of those transactions involved inflating the purchase price, falsifying the qualifications of the straw buyers in order to obtain better financing, and misrepresenting the source of the down payment as having come from the straw borrower.

105

The government produced evidence at trial that all three transactions involved fraudulent representations that the down payment came from the borrower and evidence connecting Alcindor to each of those false representations. In the Spear transaction, the fraudulent misrepresentation involved two altered checks that were either payable to, or endorsed and deposited by, Alcindor. In the second transaction, Alcindor recruited Denny, his cousin, to serve as the straw buyer, and another altered check was used to falsify the source of the down payment. The final transaction was in the name of Cortney Jackson, and it, too, involved a fraudulent misrepresentation that cash came from the borrower as well as a deposit of over $150,000 in proceeds into an account owned by Bristol Homes, a building entity that belonged to the Alcindor-Williams Group.

Alcindor makes much of his alibi that he was in St. Lucia at the time of the Denny transaction. That, however, is only one of the transactions, and even if there were no evidence to directly connect Alcindor to any of the straw transactions, there is plenty connecting him to the overall conspiracy. He is therefore liable under <u>Pinkerton</u> for the acts of his co-conspirators done in furtherance of the conspiracy even if he did not personally take part in the transactions. <u>Pinkerton v. United States</u>, 328 U.S. 640, 646–47, 66 S.Ct. 1180,

1183–84 (1946). There was enough evidence to prove him guilty on all of the counts on which he was convicted.

## D. Brown

Brown challenges the sufficiency of the evidence supporting her convictions for conspiracy (Count 19) and for wire fraud (Counts 41 and 43). To prove wire fraud under 18 U.S.C. § 1343, "it is enough to prove that the defendant knowingly and voluntarily agreed to participate in a scheme to defraud and that the use of the interstate wires in furtherance of the scheme was reasonably foreseeable." United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003).

Brown contends that there was no evidence that she intended to commit fraud in connection with the inflated appraisals she prepared for the properties that were the subject of the wire fraud counts. Her insufficiency of the evidence argument has two components. First, she emphasizes that no defendant testified that she was present when the fraud was being discussed or that she was ever asked to fraudulently inflate her appraisals. Second, she stresses that she was a secretary and novice appraiser who was learning on the job, she was inexperienced, she did sloppy work and relied on appraisals done by others, and she was an apprentice to and was supervised by Wilson, her employer, and the government has never contended that he was a participant in the fraud.

The jury could, as it did, reasonably conclude that Brown knew about the conspiracy and participated in it. Under her property appraisals, as the district court put it, the value of the property involved in the scheme "astronomically increased" almost overnight. The record includes several examples of Brown's inflated appraisals, which were essential to the scheme. For example, Hill purchased a property on Huntcliff Trace for $1,100,000, and Brown appraised the same property twice only a month later, once at $2,000,000 and then again at $2,300,000. There was no evidence of anything that would have caused the value to skyrocket more than 100 percent in a month. Another example is a condominium unit in the Deere Lofts that Hill bought for $183,000, and Brown appraised it a mere two days later for $360,000, omitting from the appraisal report any mention of the recent sale to Hill. Again, there was no evidence of any reason for the sudden jump in the "value" of the property other than the fact that it was necessary to the functioning of the conspiracy.

The jury could have inferred from all of this and other circumstantial evidence that Brown was aware of the fraud and knowingly participated in it because anyone would know that the properties she appraised had not doubled in value within such short periods of time with no legitimate explanation. A jury is

not required to put aside its common sense or to assume that defendants have none.

The other part of Brown's insufficiency argument, that she was working under the supervision of Wilson who was not charged, is equally unavailing. The core of that argument is the assumption that Wilson was not charged because he was not guilty, and if he was not guilty, then Brown wasn't either. We reject this argument which insists on innocence as a matter of law by proxy. We do not know how much Wilson knew, what he did, or why he was not charged. It may have been because there was less evidence of Wilson's guilt, or because he cooperated in some aspect of the investigation, or simply because of a mistake or oversight. We do not mean to imply that Wilson was guilty of wrongdoing, but his guilt or innocence does not matter for purposes of Brown's insufficiency argument.

Even if we assume that Wilson is every bit as guilty or innocent as Brown, the government's decision not to prosecute him does not entitle her to a judgment of acquittal. Just as an inconsistent jury verdict, standing alone, is not a basis for setting aside a conviction, United States v. Powell, 469 U.S. 57, 68–69, 105 S.Ct. 471, 479 (1984), United States v. Mitchell, 146 F.3d 1338, 1344–45 (11th Cir. 1998), neither is a prosecutor's inconsistent charging determination, see

109

Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 668 (1978) ("In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion."), Newman v. United States, 382 F.2d 479, 480 (D.C. Cir. 1967) ("Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought."). The law does not contain a perfect injustice principle providing that if some guilty parties escape punishment, all must be permitted to do so. Instead, the law accommodates imperfection and is home to the idea that it is better to have some justice than none.

Brown's arguments of limited involvement sound more in sentencing than in conviction, and undoubtedly explain why she received the lightest sentence of any of the convicted co-conspirators.

### E. Laudermill

For her role in recruiting straw buyers to participate in Hill's scheme, Laudermill was convicted of the overall conspiracy (Count 19), of filing a false credit application (Counts 31, 182), of wire fraud (Count 41), and of money

laundering (Counts 75–76, 80, 129, 133–35, 137–39, 142, 147–49, 159, 164, 170)

She challenges the sufficiency of the evidence supporting all of those convictions on the basis of what she calls her "limited involvement." Laudermill does not deny the existence of the conspiracy, or the existence of fraud, or the fact that she received proceeds for recruiting the straw borrowers. Instead, she argues that she was unaware of any fraud, and she points to the fact that she recruited her friends and family as evidence of her unawareness.

Laudermill's defense that she acted in good faith and without any knowledge of the fraud or conspiracy is belied by the evidence, which showed that she was aware that lenders were being deceived as to the qualifications of borrowers and the source of down payments. In one transaction, Laudermill even went so far as to add one of the straw buyers to her own bank account when he failed to qualify for a loan because he lacked the funds for a down payment. With her help in that regard, the straw buyer was able to submit a verification of deposit to the lender that made it appear as though he had sufficient funds when he actually did not, and in that way he was able to get the loan.

The jury also could have concluded that Laudermill knowingly participated in the fraud and the conspiracy based on her assurances to straw buyers. The evidence showed that she knew that the straw buyers were not supplying their

down payments, as they had represented to the lenders; there was testimony that she had told some of them that they did not need to have money for a down payment. Laudermill also reminded one straw borrower that the lenders were unaware of the agreements between Hill and the straw buyers that Hill would make the mortgage payments and compensate the "investors" and "recruiters."

That Laudermill used at least some of her family and friends as straw borrowers does not entitle her to escape the consequences of her conduct. If it did, everyone in a fraud scheme could avoid punishment by that simple expedient of victimizing those who trusted them the most. The jury was free to infer from the fact that Laudermill did recruit her friends and family that she was not very loyal to them, or that she let her greed unravel whatever ties she had to them, or that she simply tried not to think about it. The jury was not required to infer from the fact that she involved her friends and family that Laudermill did not know what other evidence showed she knew.

## F. Van Mersbergen

Van Mersbergen was found guilty of conspiracy (Count 19), of filing false credit applications (Counts 23–24), and of money laundering (Counts 53–56, 99, 103, 108, 110, 113, 117), and he contends that there was insufficient evidence to support any of his convictions. Essentially, Van Mersbergen argues that the

evidence was insufficient because he was an unwitting participant who was caught up in Hill's swarm of conspirators. Although he served as a straw borrower for three transactions and worked as Hill's employee and runner, Van Mersbergen insists that he lacked any knowledge of the scheme to defraud. He claims that he was simply following orders and that he relied on the statements of an attorney at one of the closings that the transactions were legal.

The government produced evidence at trial that in his capacity as a straw borrower Van Mersbergen filed falisified loan applications, he lied in occupancy statements, and he submitted fraudulent HUD-1 settlement statements to lenders. As Hill's employee, Van Mersbergen delivered checks to the closing attorneys for the down payments that were from Hill or one of Hill's associates but were represented on the HUD-1 settlement statements to have come from the straw buyers. He personally helped two other straw buyers qualify for loans by signing a fraudulent compensation check in one case and a falsified employment verification in the other. Despite his insistence that he acted only in good faith, there was plenty of evidence from which a reasonable jury could have found Van Mersbergen guilty beyond a reasonable doubt of each charge.

As for Van Mersbergen's contention that he was simply following Hill's orders, that is no defense. See O'Rourke v. Hayes, 378 F.3d 1201, 1210 n.5 (11th

Cir. 2004) ("[S]ince World War II, the 'just following orders' defense has not occupied a respected position in our jurisprudence."); United States v. Brandon, 17 F.3d 409, 438 (1st Cir. 1994) ("This 'just following orders' defense cannot stand in the face of the evidence showing that Landman knew down payments were being falsified, that he agreed to safeguard Reisch's down payment funds, and that he personally falsified two down payments by returning the funds to Reisch."). And, for reasons we have already explained, his contention that because other straw borrowers were not prosecuted he himself must not be guilty fails as well.

## IX. Alcindor's Double Jeopardy Claim

At the end of the government's case in chief, the district court heard arguments on all of the twelve defendants' Rule 29 motions for judgments of acquittal. They were taken up in alphabetical order, beginning with Alcindor's. The court orally granted Alcindor's motion for acquittal as to Counts 38 and 94, agreeing with him that the evidence did not show that he was personally involved in those fraudulent transactions, although it did show that companies he and Graham controlled were. The court then took up the motions for judgment of acquittal of the other defendants.

Ninety-three pages of transcript (and a lunch break) later, the court had heard argument on all the motions for judgment of acquittal but had not adjourned the hearing. Before the court did so, the government asked the court to reconsider its ruling earlier in the hearing granting Alcindor's motion for acquittal on Counts 38 and 94. The government argued that under Pinkerton v. United States, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84 (1946), a defendant is criminally liable for the acts of co-conspirators in furtherance of the conspiracy, even if the defendant did not personally take part in those actions. The government also pointed out that acquitting Alcindor would be inconsistent with the rulings that the court had made later in the hearing denying on Pinkerton grounds some other defendants' motions for judgment of acquittal. The court replied, "I think I made a mistake about that but I'm not sure I can fix it now," and added, "If I have the power to reconsider the ruling I'll reconsider it." Convinced that it did have power to do so, eight lines of transcript later the court reversed its earlier ruling on Alcindor's motion. It did so before the hearing on the motions for judgment of acquittal had ended and before its earlier ruling in Alcindor's favor had been reduced to writing. Alcindor objected on double jeopardy grounds to the change of ruling.

Both Alcindor and the government agree that this issue is controlled by Smith v. Massachusetts, 543 U.S. 462, 125 S.Ct. 1129 (2005). In that case the Supreme Court held that the Double Jeopardy Clause did not permit a judge to reconsider and reverse her midtrial judgment of acquittal on a charge after the defendant had rested his case but before closing arguments. Id. at 473, 125 S.Ct. at 1137. The judge had granted Smith's motion for a judgment of acquittal on one count based on insufficiency of the evidence, had made a handwritten notation on the motion that it was granted, and then the ruling was entered on the formal docket. Id. at 465, 125 S.Ct. at 1132–33. The trial proceeded and Smith's co-defendant introduced evidence. Id., 125 S.Ct. at 1133. Smith and his co-defendant rested their cases on the remaining charges. Then, just before closing arguments the prosecutor convinced the trial judge that her acquittal decision was contrary to controlling precedent, she reversed herself, and that count was submitted to the jury along with the other two. Id. at 466–66, 125 S.Ct. at 1133. Smith was convicted on all three counts, including the one that was reinstated by the trial court.

The Supreme Court reversed, concluding that a defendant could not be subjected to further fact finding proceedings about guilt or innocence after a final judgment of acquittal was entered. "[A]fter a facially unqualified midtrial

116

dismissal of one count, [if] the trial has proceeded to the defendant's introduction of evidence, the acquittal must be treated as final, unless the availability of reconsideration has been plainly established by pre-existing rule or case authority expressly applicable to midtrial rulings on the sufficiency of the evidence." Id. at 473, 125 S.Ct. at 1137.

The first question, according to Smith, is whether the trial judge's initial ruling on Alcindor's Rule 29 motion was a judgment of acquittal. Id. at 467, 125 S.Ct. at 1134. It was. For double jeopardy purposes a ruling is a judgment of acquittal regardless of its form if it "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." United States v. Martin Linen Supply Co., 430 U.S. 564, 571, 97 S.Ct. 1349, 1355 (1977). In orally granting Alcindor's Rule 29 motion, the district court "evaluated the Government's evidence and determined that it was legally insufficient to sustain a conviction," see id. at 572, 97 S.Ct. at 1355, because Alcindor was not personally involved in the transactions charged in Counts 38 and 94. That determination may have been erroneous, but we will assume for the sake of discussion that it was a judgment of acquittal.

The remaining question is whether that judgment of acquittal was final and therefore not subject to reconsideration. Under Smith once an acquittal becomes

117

final it may not be reconsidered on appeal or otherwise.[32]  Smith, 543 U.S. at 469

n.4, 125 S.Ct. at 1135 n.4 (citing Smalis v. Pennsylvania, 476 U.S. 140, 106 S.Ct.

1745 (1986) and Justices of Bos. Mun. Court v. Lydon, 466 U.S. 294, 104 S.Ct.

1805 (1984)).  Although the Supreme Court in Smith did not announce a generally

applicable rule about when an acquittal becomes final for these purposes, it did

indicate that the point of finality is passed when changing the ruling would require

the accused to stand trial a second time for the same offense.  Id. at 473 n.7, 125

S.Ct. at 1137 n.7.  And we know, of course, from Smith itself that once a trial has

moved on from the judgment of acquittal to the presentation of evidence in further

fact finding proceedings, it is too late for a court to take back that judgment.

The Supreme Court, however, indicated in Smith that a judgment of

acquittal is not final as soon as it is spoken or written.  Responding to concerns

that a judge might never be able to correct an erroneous judgment of acquittal, the

Court explained that "[d]ouble-jeopardy principles have never been thought to bar

the immediate repair of a genuine error in the announcement of an acquittal, even

one rendered by a jury."  Smith, 543 U.S. at 474, 125 S.Ct. at 1138.  "Moreover, a

prosecutor can seek to persuade the court to correct its legal error before it rules,

or at least before the proceedings move forward."  Id., 125 S.Ct. at 1138 (emphasis

---

[32]The government does not contend that the exception Smith left open for plainly established pre-existing rule or case authority, Smith, 543 U.S. at 473, 125 S.Ct. at 1137, applies in this case.

added). Those last seven words are important, and their meaning is illustrated by what the prosecutor did and failed to do in the <u>Smith</u> case.

The prosecutor in that case did not convince the judge to alter or amend her ruling before the proceedings moved on to the next stage. Instead, the prosecutor rested the Commonwealth's case, Smith's co-defendant put on a witness, and Smith and the co-defendant rested. Only then, and just before closing arguments were to begin, did the prosecutor persuade the court to take back its judgment of acquittal. As the Supreme Court explained, "[h]ad [the prosecutor] sought a short continuance at the time of the acquittal motion, <u>the matter could have been resolved satisfactorily before petitioner went forward with his case</u>." <u>Smith</u>, 543 U.S. at 475, 125 S.Ct. at 1138 (emphasis added).

In this case, by contrast, the matter was "resolved satisfactorily before [Alcindor] went forward with his case." <u>See</u> <u>id.</u>, 125 S.Ct. at 1138. And that makes all the difference. Nothing was done, or could have been done, in reliance on the acquittal ruling between the time that ruling was announced and the time it was rescinded. All that happened in the interval (other than a lunch break) was that the court continued to hear and decide motions for judgment of acquittal from the other defendants. No one put on any evidence. No one opened or closed his case. No one did anything in front of the jury. The proceedings did not move

119

forward until after the hearing on all of the motions to acquit had concluded, and by that time the judgment acquitting Alcindor on the two counts had already been rescinded.

Smith had "no reason to doubt the finality of the state court's ruling," Smith, 543 U.S. at 470, 125 S.Ct. at 1135, and every reason to believe that his acquittal on one of the charges was final after the prosecutor had rested, the co-defendant had put on evidence, and then both she and Smith had rested their cases. By contrast, Alcindor had no reason to believe that his acquittal was final before the hearing on the motions to acquit had even concluded. See Price v. Vincent, 538 U.S. 634, 643 n.2, 123 S.Ct. 1848, 1855 n.2 (2003) (collecting cases finding no double jeopardy violation in similar circumstances). There was no double jeopardy violation.

## X. Rector's *Kastigar* Claim

### A. Introduction

The investigation in this case began in 2001, but the first indictment was not returned until 2005. In February of 2003, Rector began cooperating with the government in the hopes of receiving leniency. He was interviewed extensively — he claims for about 60 or 70 hours. He also provided the government with a large number of documents — he claims it was hundreds of documents amounting

to "hundreds, if not thousands, of pages." Rector's cooperation was provided under the terms of a proffer agreement in which the government promised Rector that, if the negotiations failed, it would not use the information he provided against him in its case in chief, with certain exceptions. Disagreement about the nature and extent of those exceptions gave rise to this issue after the government and Rector failed to reach a plea bargain agreement.

## B. The Pre-Trial Motions

The first rumblings the record reveals about this issue occurred on the eve of trial when the government filed a motion in limine to prevent Rector from arguing to the jury in his opening statement or otherwise that the government had indicted him in retaliation because it did not like what he had said during the proffer interviews. The motion asserted that since Rector had sought and received protection in the agreement from the government's using against him statements he made to investigators, it would be unfair for him to use against the government the fact that he had made statements. The court indicated that if Rector did use before the jury the fact that he had cooperated, the government would be allowed to introduce in its case in chief the statements Rector had made while cooperating.

Rector reacted to that prospect with a written response to the government's motion in limine. In his response Rector argued that under the terms of the proffer

agreement no information or documents that he had provided or any derived leads could be used against him, unless he testified at the trial contrary to the statements he had made under the proffer agreement. He asserted that it was critical to his defense that the jury know he had cooperated with the government, and argued that allowing the government to use statements he had made or documents he had supplied under the proffer agreement, or leads derived from them, would deprive him of a fair trial and the benefit of his proffer bargain.

On the same day that Rector filed his motion in response to the government's motion in limine, he also filed his own motion in limine seeking to exclude from the trial any evidence the government had obtained as a result of his cooperation. In that motion, Rector claimed that under Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653 (1972), the government was barred by the proffer agreement "from presenting to or arguing to the jury any and all evidence it obtained, either directly or indirectly, from information and documents [he] provided to the government." Rector pointed to the language in the agreement which prohibited the use against him of "[a]nything related to the proffer . . . in any government case-in-chief." He asked the court to enforce the proffer agreement and argued that under Kastigar and the terms of the agreement that "the

government has an affirmative duty to prove to the Court that no part of its case against [him] is 'related' to the information [he] provided."

Soon thereafter, Rector supplemented his motion in limine with another motion and exhibits consisting of memoranda prepared by the government's investigators detailing his substantial cooperation. For example, the memoranda showed that Rector had provided the government with four books of documents, with copies of lease agreements, with copies of W-2 forms, and with other documents, all detailing the relationships between Hill and his investors. Rector argued that the investigators' memoranda showed that he "was the source, either directly or indirectly, of much of the evidence the government intends to introduce in the trial of this case." In light of the government's affirmative burden to prove that the evidence it planned to present against Rector had not been obtained as a result of his proffer, he argued that the government should be required to demonstrate outside the presence of the jury that it had an independent source for every document or witness it planned to introduce against him at trial.

Not relishing the prospect of delaying the trial while it conducted a hearing on the parties' dispute about the proffer agreement, the district court took Rector's motions "under advisement." If the court ever expressly ruled on those motions, the parties have not cited that ruling to us and we have not been able to

find it.  As we have mentioned, however, the court had already indicated that if Rector put before the jury the fact that he had cooperated with the government, the government could introduce the statements he made while cooperating. Undoubtedly as a result of that ruling, Rector's counsel did not mention Rector's cooperation to the jury during his opening statement or at any other time during the trial.

## C.  The Issue During and After the Trial

During the course of the trial, Rector did unsuccessfully object on at least eleven different occasions to the admission of documents on the ground that they had been derived from his proffer statements.  He did not object on that ground to any testimony.

After Rector was convicted on 95 of the 120 counts against him that were submitted to the jury,[33] he filed a "Motion to Dismiss Convicted Counts," which asserted that it was filed "pursuant to Rule 33 of the Federal Rules of Criminal Procedure and the Fifth Amendment to the Constitution of the United States and the Due Process Clause."  In that motion Rector asked the district court  "to dismiss the counts of which he was convicted" on the ground that the government had violated the proffer agreement by using against him at trial information and

---

[33] Rector was convicted of conspiracy, mail fraud, wire fraud, and making false credit applications as charged in Counts 19, 32, 34–38, 41–48, 63–85, 89–90, 129–49, 151–54, 158–87 of the indictment.

documents he had provided, as well as other evidence obtained through leads he had provided. The motion promised that a supplemental one would be filed, and it was.

In his supplemental post-trial motion, Rector argued that any ambiguity in his proffer agreement should be construed against the government as the drafter, citing United States v. Pielago, 135 F.3d 703 (11th Cir. 1998). He asserted that the proffer agreement the government had drafted and signed broadly prohibited it from using information directly obtained from him or indirectly obtained from him through use of the information and documents he had provided. Rector argued that the government had clearly used against him at trial information "related to" — the key term from the agreement — his statements and documents. Specifically, he asserted that he had provided the government with information related to 24 of the witnesses that the government called at trial, 19 of the entities discussed in the government's case in chief, 148 end-user lease agreements, and the documents that were later introduced as Government Exhibits 409, 546, 913, 917, and 918. He also asserted that he was one of the first people interviewed as part of the government's investigation and that his cooperation led to much of the evidence the government used at trial. In fact, according to Rector, his

cooperation was so instrumental to the government's case that his "proffers mirror the government's case."

The government responded to Rector's supplemental motion by arguing that it was the well-established policy of the United States Attorney's Office to grant only direct use immunity, not derivative use immunity, in proffer agreements and that its agreement with Rector was consistent with that policy. The government also argued that Rector's agreement was not controlled by Kastigar because that case involved a statutory grant of immunity, which necessarily prohibits derivative use as well as direct use. By contrast, Rector's immunity agreement was contractual in nature and therefore was controlled by the terms of the agreement.

The government conceded that under Pielago and other decisions an ambiguous proffer agreement is to be construed against the government as the drafter. It argued, however, that while Rector's proffer agreement prohibited direct use of statements he had made and documents he had provided, it unambiguously permitted the use of those statements and documents to "develop leads; seek like documentation from other sources; or to question other witnesses about certain conduct or refresh a witness' own recollection."

The government's position was that the proffer agreement was not ambiguous and none of its terms were in conflict because, under Pielago, "a

126

proffer's 'derivative use' provision should be read as qualifying, instead of contradicting, the paragraph of the proffer agreement prohibiting the 'direct use' of statements and information obtained in a proffer." If that position were accepted, the government could use against Rector any evidence that was derived from statements he made or documents he supplied during the proffer period.[34] The government's position was based on the language of the agreement providing that "the Government is completely free to pursue any and all investigative leads derived in any way from the proffer."

The government opposed Rector's request for an evidentiary hearing by arguing that "it would make no sense to hold a hearing in which the government would have to prove that its evidence against Rector is not directly or indirectly traceable to the information [he] provided [because] . . . [t]he proffer agreement expressly permits the government to do just that."

The government denied Rector's contentions that he had provided documents that were later introduced as exhibits at trial. It asserted that "[t]he source of every piece of documentary evidence was identified at the trial, either

---

[34]The government also contended that it was free to use any statements Rector had made before the proffer agreement, and that it also could use any statements and documents obtained from him during the period of the agreement to rebut his testimony or in a perjury prosecution. Rector does not contest the last two of those points about use in rebuttal or in a perjury prosecution, but he never testified, so they are irrelevant. As to the first point, about pre-agreement statements, the record does not indicate that any of those were used at the trial, so that point appears to be irrelevant as well.

through a stipulation as to its source and authenticity or through the producing witness on the stand," and it insisted that none of that evidence had come from Rector. In other words, Rector was not "the lynchpin of the investigation" that he made himself out to be. Instead, the government argued that it had received much of the same evidence from multiple sources.

In his reply to the government's response, Rector pointed out that the proffer agreement expressly permitted the government to use any information he supplied to rebut any testimony from him that was contrary to his proffered statements and in a prosecution of him for perjury. His point was that there was not a similar provision expressly permitting the government to use the information he provided to develop other evidence to use against him even though he did not testify and was not prosecuted for perjury.

In support of his construction of the agreement, Rector contrasted its terms with those of another one the government had drafted and entered into with a different defendant in this case, one who did not go to trial. That other agreement prohibited the use of proffer-derived information in grand jury proceedings but expressly permitted the use of it against that defendant in his trial if no plea agreement were reached. The same was true of the proffer agreement in the Pielago case. See Pielago, 135 F.3d at 710. Rector also pointed out that the

128

immunity-promising language the government put in his proffer agreement was broader than the language it put into the proffer agreements it entered into with Alcindor and some of the other co-defendants.

As for the government's contention that Rector's proffer agreement expressly provided for derivative use, Rector argued that the government's interpretation "improperly tries to equate the right to 'pursue' investigative leads with the right to 'use' such evidence against Rector in its case in chief." Furthermore, if the agreement's proscription precluded only the direct use of information related to Rector's proffer, then the language permitting the government to "pursue any and all investigative leads derived in any way from the proffer" would be superfluous. In addition, Rector relied on United States v. Schmidgall, 25 F. 3d 1523, 1529 n.5 (11th Cir. 1994), to counter the government's position that he was not entitled to a Kastigar hearing merely because his immunity stemmed from an informal agreement instead of a statute.

### D. The August 16, 2007 Hearing

Following the salvo of motions, on August 16, 2007 the court held a hearing on Rector's post-trial motion to dismiss on Kastigar grounds all of the counts on which he had been convicted. Rector told the court that the government had admitted using in its investigation evidence that it had derived from his proffer.

129

The court asked the Assistant United States Attorney if that was true. She responded: "Derivative use, Your Honor. Not — when you say used, I mean, to — in furthering the leads in the case and in interviewing witnesses." While adamantly denying that any of Rector's information or statements were directly admitted at trial, she conceded that "we did what the Government always does in these cases, and that is, we followed in a derivative way; that is, used these things for leads and so forth." She argued that if the proffer agreement barred derivative use of Rector's statements against him, the government would have had to create a "taint box," which it had not done in this case because "no one does it." In other words, the AUSA admitted that there had been no effort to separate the attorneys and agents who interviewed and obtained documents from Rector from those who subpoenaed documents, interviewed witnesses, prepared the case for trial, and eventually tried the case against Rector. There was no taint box, no Chinese wall. Everyone involved in the prosecution had access to all of Rector's proffered statements and documents. Or so the representative of the government admitted on that occasion.

After hearing from both sides, the district court agreed with Rector that the proffer agreement prohibited the government from using against him any evidence obtained by using the information and documents he had given the government

130

during the proffer period. The court told the government that under its reading of the proffer agreement, "you can investigate all you want, but this says you're not going to use anything that he gives you against him in his case in chief." The court asked the government to respond in writing with a supplemental motion identifying an independent source for each of the exhibits that Rector had claimed were violations of the proffer agreement.

Rector pointed out to the district court that even if the government were able to identify an independent source for each of the exhibits he had objected to, that did not mean that the government had not breached the agreement. As he explained, the exhibits he identified were only examples of what he had provided the government. Rector's counsel stated, "I obviously can't tell you all the evidence, particularly when they've admitted that they used the leads to get other evidence, get in documents." The government's theory during the investigation and trial was that it could use the information Rector supplied not only for the purpose of pursuing leads against others but also in order to obtain evidence to use in its case in chief against Rector. Rector's counsel argued that "I don't know how you get away from that by saying, well, now, we got the documents from [Rector] and you call someone else to bring [those documents] with you."

E. The Post-Hearing Motions

131

After the August 16, 2007 hearing, the government filed its supplemental response to Rector's motions. The lengthy supplemental response included some documents submitted in camera as well as three binders of documents purportedly establishing an independent source for the specific evidence that Rector had alleged violated the proffer agreement. The government argued that to the extent it had put into evidence anything obtained from Rector, that evidence was only used against other defendants and related to counts in which Rector was not charged.

The government's response summarized the extensive evidence of Rector's guilt that it had before he started cooperating under the proffer agreement, and it argued that Rector had exaggerated the extent of his cooperation, pointing out that others had cooperated long before Rector did. The government insisted that all the evidence used against Rector at trial came from the witnesses who had been interviewed or from documents that had been subpoenaed before Rector began cooperating.

The government added that Rector had waived any challenge to the admission of some of its exhibits at trial. For example, the government pointed out that Exhibits 1–54 and 60–325 were admitted pursuant to a stipulation signed by all of the defense attorneys, including Rector's counsel, on behalf of their

132

clients.  The government also argued that any <u>Kastigar</u> issues  involving any of the other evidence to which Rector had not objected were waived because the district court had denied Rector's request for a continuing objection on that ground to all of the evidence.

Rector filed a "partial reply" to the government's supplemental response. He characterized his motion as only a partial reply because he insisted that he could not adequately reply to the government's response without additional discovery.  Rector requested a chance to review the documents that the government had submitted <u>in</u> <u>camera</u> as well as other documents, including:  "all subpoenas issued by the government after the initial proffer of the Defendant; all diaries and memoranda of the government agents involved in the Hill investigations; all internal government memoranda concerning the Hill investigation after the Defendant's proffer; and all documents obtained by the government after the Defendant's initial proffer."

Rector pointed out that even if the government had received evidence from other sources before he started cooperating, several of the government's witnesses were interviewed after he had provided information, and the burden was on the government to demonstrate an independent source for the testimony of those witnesses.  Furthermore, Rector argued, any evidence obtained from him and

133

admitted at trial constituted a violation of the proffer agreement even if that evidence pertained only to charges against other defendants because Rector was denied a severance and "the government blended all counts, facts, documents and witnesses together."

Responding to the government's argument that he had waived any objections to the admissibility of certain documents based on his stipulations to their authenticity, Rector pointed out that the stipulations did "not waive any objection to the admission of said document[s] on any other grounds." He also reiterated that the burden was not on him to ensure that the agreement was enforced, but instead the burden was on the government to ensure that the agreement was not breached. For support, Rector cited United States v. Gregory, 730 F.2d 692 (11th Cir. 1984), in which we explained that "a [Kastigar] ruling only on [the admission of] those items identified [and objected to] by the defendants is not sufficient" because the "defendants could not be presumed to have knowledge of all of the evidence presented to the grand jury or employed in the Government's investigation." Id. at 698. We had remanded that case for an evidentiary hearing for the government to "show how it acquired all of the evidence admitted below." Id. (citing United States v. Seiffert, 463 F.2d 1089, 1092 (5th Cir. 1972)).

## F.  The December 12, 2007 Hearing

Following this second volley of responses and replies, the district court scheduled a second hearing on Rector's motion to dismiss, noting that Rector's counsel would have an opportunity to review documents submitted in camera and make further arguments to the court.  The hearing was scheduled for  December 12, 2007.  On that date, the court gave Rector's attorney approximately 30 minutes to review all of the transaction reports and grand jury subpoenas that predated Rector's proffer, and then it denied his request for an evidentiary hearing.  The court found that "the parties [had] submitted everything that could be submitted on this issue of whether or not the agreement has been violated."  It noted that Rector had "submitted all of [his] interviews," and "exhibits that [he] contend[ed] were derived or the fruits of those interviews," and the "Government [had] gone to massive effort and submitted these three huge notebooks of materials plus all the material that [Rector] reviewed in camera today."

Despite finding that the language of the proffer agreement was broad enough to encompass derivative use, the court concluded that "as to each exhibit to which there was an objection the Government's supplemental response shows that the Government had an independent legitimate source for the document," and, therefore, "the Government [had] met its burden of showing that there was no

135

violation of the proffer agreement." (emphasis added). The court further concluded that Rector's motion to dismiss should be denied because: (1) his statements and the documents he provided were not admitted at trial; (2) he had not objected to the testimony of any witnesses on the grounds that it was derived from (or "related to") his proffer; (3) the government was not required to negate every possibility that evidence tainted by Rector's proffer was used against him; and (4) any error was harmless beyond a reasonable doubt. On those bases the court denied Rector's motion to dismiss all of the counts on which he had been convicted.

## G. The Kastigar Issue on Appeal

Rector contends that the government breached the proffer agreement and thereby violated his rights to due process and a fair trial. In reviewing the district court's decision of this issue, "we resolve issues of law, including the meaning of [Rector's] immunity agreement, de novo." United States v. Schwartz, 541 F.3d 1331, 1355 n.69 (11th Cir. 2008). We review the district court's denial of an evidentiary hearing only for an abuse of discretion, and any fact findings only for clear error. United States v. Kapordelis, 569 F.3d 1291, 1308, 1313 (11th Cir. 2009). A court, by definition, abuses its discretion when it bases a decision on an erroneous legal premise. Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035,

2047 (1996); <u>Young v. New Process Steel, LP</u>, 419 F.3d 1201, 1203 (11th Cir.

2005); <u>United States v. Brown</u>, 332 F.3d 1341, 1343 (11th Cir. 2003).  A clear

error in judgment also constitutes an abuse of discretion, as does a decision

applying the law in an unreasonable or incorrect manner.  <u>Norelus v. Denny's,</u>

<u>Inc.</u>, 628 F.3d 1270, 1280 (11th Cir. 2010); <u>Brown v. Ala. Dept. of Transp.</u>, 597

F.3d 1160, 1173 (11th Cir. 2010); <u>Moorer v. Demopolis Waterworks & Sewer</u>

<u>Bd.</u>, 374 F.3d 994, 996–97 (11th Cir. 2004).

"Due process requires the government to adhere to the terms of any plea

bargain or immunity agreement it makes."  <u>United States v. Harvey</u>, 869 F.2d

1439, 1443 (11th Cir. 1989) (en banc).  And "because due process requires us to

enforce the government's agreement . . . , we apply the same rules and method of

analysis to an informal grant of use or transactional immunity as we would to a

formal grant."[35]  <u>Id.</u> at 1444.  Since Rector's immunity stems from his agreement

---

[35] This is not inconsistent with our conclusion in <u>Taylor v. Singletary</u>, 148 F.3d 1276 (11th Cir. 1998), that an informal immunity agreement does not provide the same protections as a formal statutory grant of immunity under 18 U.S.C. §§ 6001–6003. <u>Id.</u> at 1282–83 n.7. In <u>Taylor</u>, we held that a habeas petitioner's testimony given under an informal immunity agreement in an earlier federal prosecution was not <u>per se</u> involuntary, which might have prevented it from being used to impeach his testimony at his own state prosecution. "Because an informally-immunized witness retains his Fifth Amendment privilege, he must invoke that privilege if he wishes to preclude the use of the testimony against him in a criminal case; he cannot later claim that he was 'compelled' to testify simply because he fulfilled his promise to the prosecutor and did not invoke the privilege." <u>Id.</u>

This case is not like <u>Taylor</u>. Rector does not suggest that he was compelled to testify against himself. Instead, Rector insists that the government breached its agreement with him not to use in its case in chief the information that he had provided it, and by doing so the government

with the prosecutor and not from a formal statutory grant of immunity, in order to determine the scope of his immunity, we must look to and, if necessary, interpret the text of the agreement. Taylor, 148 F.3d at 1284 ("When enforcing an immunity agreement, we look to the terms of the agreement itself . . . ."); United States v. Thompson, 25 F.3d 1558, 1562 (11th Cir. 1994) ("In determining the extent of immunity afforded a defendant under an [informal] immunity agreement, a court should apply basic principles of contract law."). In this sense, the proffer agreement is a contract Rector is seeking to enforce. The contracting parties disagree about the meaning of its terms.

## 1. The Scope of the Proffer Agreement

We must first determine the scope of the promise the government made to Rector in the proffer agreement. The district court ruled that the government had promised not to use in its case in chief against Rector any evidence derived from the information and documents he provided under the agreement. We agree. The proffer agreement states, in relevant part, that:

> Anything related to the proffer cannot and will not be used against [Rector] in any Government case-in-chief. Nor would any statements be used against [Rector] to increase his offense level pursuant to the Sentencing Guidelines (Section 1B1.8) should charges be filed or a conviction occur. However, any previous statements by [Rector] do not

violated his rights to due process and a fair trial. Although an informal grant of immunity does not bring with it the full panoply of benefits associated with a statutory grant of immunity, the government still must be held to its end of the bargain.

fall within this 1B1.8 protection.  Also, <u>the Government is completely free to pursue any and all investigative leads derived in any way from the proffer</u>.  Similarly, nothing, including Rule 11(e)(6), Federal Rules of Criminal Procedure, shall prevent the Government from using the substance of the proffer and/or leads derived therefrom for impeachment or in rebuttal testimony should [Rector] subsequently testify in any proceeding contrary to the substance of the proffer or in a prosecution for perjury, false statements, or obstruction of justice.

(emphasis added).

The two sentences to which we have added emphasis point in opposite directions.  The first one points toward Rector's position because the participial phrase "related to" is a broad one, and evidence developed using the information he proffered is "related to" the proffer.  See <u>Moshea v. Nat'l Transp. Safety Bd.</u>, 570 F.3d 349, 352 (D.C. Cir. 2009) ("Without getting into a metaphysical discussion of the meaning of the phrase 'related to,' it suffices here to say that the words 'related to' are broad.") (citing <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 307–08, 115 S.Ct. 1493, 1498–99 (1995)); <u>Pennzoil Exploration and Prod. Co. v. Ramco Energy Ltd.</u>, 139 F.3d 1061, 1067 (5th Cir. 1998) ("[C]ourts distinguish 'narrow' arbitration clauses that only require arbitration of disputes 'arising out of' the contract from broad arbitration clauses governing disputes that 'relate to' or 'are connected with' the contract."); <u>Random House Webster's Unabridged Dictionary</u> 1626 (2d ed. 1993) (defining "related" to mean "associated[,] connected," and "allied by nature, origin, kinship, marriage, etc.").  The second

139

emphasized sentence points toward the government's position because the combined force of the adverb and predicate adjective "completely free," which describes the liberty the government has to pursue investigative leads derived from the proffered information, is also broad. When two sentences diverge in a single paragraph and the reader cannot tell which direction to take, the one who laid out the diverging paths loses. Ambiguities are construed against the government as the drafter of proffer agreements, Pielago, 135 F.3d at 709–10, Harvey, 869 F.2d at 1452, and that makes all the difference.

There is also force to Rector's point about the agreement explicitly providing that nothing would prevent the government "from using the substance of the proffer and/or leads derived therefrom for impeachment or in rebuttal testimony should [Rector] subsequently testify in any proceeding contrary to the substance of the proffer or in a prosecution for perjury, false statements, or obstruction of justice." The point is that the agreement expressly permits the government to use leads derived from the proffered information against Rector in specified circumstances, none of which is its case in chief. The inference is that which is not included is excluded. See In re Celotex Corp., 487 F.3d 1320, 1334 (11th Cir. 2007) ("The doctrine of expressio unius est exclusio alterius instructs that when certain matters are mentioned in a contract, other similar matters not

140

mentioned were intended to be excluded.") (quotation omitted); United States v. Transfiguracion, 442 F.3d 1222, 1232 (9th Cir. 2006) (construing plea agreement against the government and applying the canon of expressio unius est exclusio alterius); see also United States v. Koonce, 991 F.2d 693, 698 (11th Cir. 1993) ("The [expressio unius interpretative] canon is frequently cited and employed because in many circumstances it makes good sense.").

Finally, there is also the fact that in other proffer agreements, including ones the government used with other defendants in this very case, it expressly reserved the right to use derived evidence against the defendant. For example, the agreement the government drafted and entered into with co-defendant Alcindor stated that the government "reserves the right to pursue any and all investigative leads derived from statements and information and to use such derivative evidence in any criminal or civil proceeding against Mr. Alcindor and others." See Schwartz, 541 F.3d at 1355 (quoting the proffer agreement in that case which expressly provided that "[t]he United States may make derivative use of the statements [the defendant] makes during the proffer and may pursue investigative leads therefrom, and would not be required to prove an independent source at any Kastigar or other hearing held thereon."); Pielago, 135 F.3d at 710 (quoting the proffer agreement in that case which stated that "[t]he government also expressly

141

reserves the right to pursue any and all investigative leads derived from [the defendant's] statements or information and use such derivative evidence in any criminal or civil proceeding against her and/or others."). The agreements it drafted in <u>Schwartz</u>, in <u>Pielago</u>, and in this very case for co-defendant Alcindor show that the government knows how to clearly and expressly reserve the right to make derivative use of proffered information against the one supplying it when the government wants to do so. For whatever reason, the government did not do that in Rector's case. Because of that, and given the ambiguity in the language it did use, the government was not entitled to use derivative evidence against Rector, who never took the stand and who was not being prosecuted for perjury or false statements or obstruction of justice.

For those reasons, we agree with the district court's interpretation of the proffer agreement: it forbids the use of derivative evidence against Rector. For the reasons that follow, however, we disagree with the district court about whether the hearing it conducted was sufficient for it to decide that the government did not use against Rector any evidence derived from the information he supplied under the proffer.

2. The Denial of an Evidentiary Hearing on the Issue of Whether Derivative Evidence Was Used Against Rector

"[W]hen presented with a <u>Kastigar</u> challenge, a court's task is to determine whether any of the evidence used against the defendant was in any way derived from his compelled immunized testimony." <u>Schmidgall</u>, 25 F.3d at 1528; <u>United States v. Hampton</u>, 775 F.2d 1479, 1485 (11th Cir. 1985). The government has the burden of proving that all of the evidence it obtained and used against the defendant, including the testimony of other witnesses, was untainted at every step of the investigation by immunized testimony. <u>See</u> <u>Schmidgall</u>, 25 F.3d at 1528 (citing <u>Hampton</u>, 775 F.2d at 1489). Even if the government did use immunized testimony in its case against Rector, "an indictment or conviction may be upheld on a finding that the use of such tainted evidence was harmless beyond a reasonable doubt." <u>Schmidgall</u>, 25 F.3d at 1529.

The district court made several legal errors in deciding that the hearing it conducted was sufficient for it to conclude that the government had not violated its agreement not to use derivative evidence against Rector. One of those errors is that, at the government's urging, the court considered the derivative evidence issue only as to the evidence to which Rector had objected during the trial. That is contrary to our decision in <u>United States v. Gregory</u>, 730 F.2d 692 (11th Cir. 1984). In that case, as in this one, the district court required the government to show an independent source for only the evidence that the defendants had

143

identified and objected to. We found "no support for affirmance of that practice in light of Kastigar, and this Court's application of Kastigar in United States v. Seiffert, 463 F.2d 1089 (5th Cir. 1972)." Id. at 698. We explained that the problem was that "[t]he defendants could not be presumed to have knowledge of all of the evidence . . . employed in the government's investigation. Under such circumstances, a ruling only on those items identified by the defendants is not sufficient." Id.; see also Hampton, 775 F.2d at 1485 ("[I]n order to sustain [an] indictment, the government [has] the burden of establishing that all of the evidence presented to the grand jury (and ultimately all of the evidence to be utilized at trial) was derived from legitimate, independent sources."). We remanded for an evidentiary hearing to determine whether the government could prove that all of the evidence it introduced at trial — not just the evidence the defendants objected to — was derived from a source independent from the testimony that was compelled under a grant of immunity. Gregory, 730 F.2d at 698.

Our Gregory decision requires a remand for a full evidentiary hearing in this case at which the government will have the burden of showing that it did not violate the terms of its proffer agreement with Rector. The government must

"show how it acquired <u>all</u> of the evidence admitted [against Rector] below."

<u>Gregory</u>, 730 F.2d at 698 (quoting <u>Seiffert</u>, 463 F.2d at 1092).

Although the government included portions of interviews conducted and copies of subpoenas issued before Rector's proffer as part of the materials it submitted to the district court, that was not enough to carry its burden. Those materials did not rule out the possibility that some of the information that Rector supplied was used to develop some of the evidence presented against him at trial. The inquiry that <u>Gregory</u> and decisions like it require can seldom be satisfied by a mere document dump. And even if it could be, the defendant must be given adequate time to pick through the dump. Rector's counsel was given only 30 minutes to review all of the <u>in camera</u> materials that the government had submitted to the court.

There is another problem with the procedure that was followed. Despite Rector's request, the hearing on the <u>Kastigar</u> issue was not an evidentiary one, at least not in the sense that testimony was taken (although documents were submitted). As we have explained, "[u]nless the government relies solely upon evidence obtained prior to the immunized testimony, the principles of <u>Kastigar</u> generally require (as a practical matter) a showing that prosecuting officials and their agents were aware of the immunity problem and followed

145

reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations." Hampton, 775 F.2d at 1490 (citation omitted). It is undisputed that the government attorneys and agents were unaware of the derivative use problem and made no effort to keep the information Rector provided and its fruits away from those who prosecuted him at trial.

We know that they made no effort to do that because at the August 16, 2007 hearing the government took the position that it had been completely free to use derivative evidence against Rector. The AUSA told the court, among other things, that it was perfectly okay for the government to use Rector's information in a "classic derivative" way by confronting another witness with it in order to persuade him to plead guilty and testify against Rector. That "classic derivative" use of Rector's testimony would have violated the proffer agreement as the district court and this Court have interpreted it. See Schmidgall, 25 F.3d at 1528 ("Prohibited indirect derivation includes using immunized testimony to help shape the questioning of another witness.").

We know that the government's attorneys and agents took no precautions to ensure that the information Rector supplied was not used to develop evidence against him because that is what the AUSA told the district court at the August 16, 2007 hearing. She forthrightly admitted that if the government had known the

proffer agreement barred derivative use of Rector's statements against him, the government would have had to create a "taint box," which it did not do in this case because "no one does it."  By "no one does it," we assume she meant that the government had been careful in other cases to draft immunity agreements to permit derivative use, something it neglected to do in Rector's case.

There is another fact that stands up and shouts from the transcript.  Before she knew that the district court would rule otherwise, the AUSA conceded to the district court that "we did what the Government always does in these cases, and that is, we followed in a derivative way; that is, used these things for leads and so forth."  That statement can be interpreted as an admission that the government did violate the proffer agreement, as the district court and this Court have interpreted it.  The AUSA's statement may be subject to another interpretation but, at the very least, if she fails to testify and credibly explain that statement, the government will not be able to carry its burden of proving that it made no derivative use of Rector's information.[36]  In view of all of these circumstances, a thorough evidentiary inquiry, including testimony from all of those who built and presented the case

_____

[36]We do not mean to imply that the AUSA or anyone involved in the investigation or presentation of the government's case acted in bad faith in regard to the proffer agreement.  It is evident that the attorneys for the government interpreted that agreement differently from the way that the district court and this Court have interpreted it.  Their different interpretation, however, does make it more likely that the agreement was violated, albeit not in bad faith.  Bad faith is not required for a violation of the proffer agreement.

147

against Rector, is necessary for the district court to determine whether the government has carried its burden of proving that there was no derivative use.

The district court did find, alternatively, that any violation of the proffer agreement was harmless beyond a reasonable doubt. That finding was premised, however, on the mistaken belief that the derivative use inquiry was limited to the evidence to which Rector had objected. No reliable harmlessness determination can be made until a full evidentiary hearing is conducted into the derivative use issue as to all of the evidence used against Rector. Only after that hearing will the district court be able to reliably determine which evidence the government has failed to show was obtained independently and whether the admission of that evidence was harmless.

We realize that the evidentiary hearing will be a burden on the district court and the attorneys for both sides, but that is what the law requires under the particular circumstances of this case.[37] We will vacate the district court's order denying Rector's motion to dismiss the counts on which he had been convicted and will remand his case for further proceedings consistent with this opinion.

---

[37]By stating that the law "requires" an evidentiary hearing, we do not mean to imply that the parties are precluded from avoiding the necessity for that hearing and further proceedings by settling the case. Before we ordered him released pending this appeal, Rector had already served approximately three years of his 84-month sentence and it may be that the parties can negotiate a plea bargain at this stage of the case. We are not recommending that to the parties but mention the possibility of it only to make it clear that our decision does not preclude it.

## XI. Sentencing Issues

Hill, Farmer, and Laudermill challenge their sentences on both procedural and substantive grounds.[38] We review sentencing decisions only for an abuse of discretion, using a two-step process. United States v. Shaw, 560 F.3d 1230, 1237 (11th Cir. 2009); see also United States v. Irey, 612 F.3d 1160, 1245–49 (11th Cir. 2010) (en banc). First, we review the sentencing decision to "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence — including an explanation for any deviation from the Guidelines range." Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 597 (2007); Shaw, 560 F.3d at 1237. If we conclude that the sentence was procedurally reasonable, we then proceed to the second step to determine whether it was substantively reasonable under the totality of the circumstances. Shaw, 560 F.3d at 1237.

---

[38]The only sentencing-related claim that David Thomas raises is that his counsel was ineffective at sentencing for failing to request a reduction of his guidelines offense level for acceptance of responsibility, notwithstanding the fact that he pleaded not guilty and went to trial. "We will not generally consider claims of ineffective assistance of counsel raised on direct appeal where the district court did not entertain the claim nor develop a factual record. If the record is sufficiently developed, however, this court will consider an ineffective assistance of counsel claim on direct appeal." United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002) (citations omitted); see also United States v. Millwood, 961 F.2d 194, 195 (11th Cir. 1992) (declining to consider ineffective assistance of counsel claim on direct appeal from defendant's sentence). The record is not sufficiently developed for us to decide this claim.

A.  The Procedural Reasonableness Claims

1.  Alleged Mandatory Presumption in Favor of the Guidelines

Hill, Laudermill, and Farmer contend that their sentences are procedurally unreasonable because the district court applied a presumption in favor of the range of sentences recommended by the guidelines.  They base their contention not just on comments at sentencing in this case in 2007 but also on the same judge's remarks in three unrelated cases from 2005 that purportedly indicate he considered the guidelines either binding or presumptively reasonable, contrary to the Supreme Court's holding in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), as developed in Rita v. United States, 551 U.S. 338, 127 S.Ct. 2456 (2007).  According to these three appellants, it was the judge's policy to impose a sentence within the guidelines range unless there were unusual circumstances that would result in fundamental unfairness approaching a miscarriage of justice.

"A sentence may be unreasonable if it is the product of a procedure that does not follow Booker's requirements, regardless of the actual sentence."  United States v. Hunt, 459 F.3d 1180, 1182 n.3 (11th Cir. 2006).  While it is permissible for appellate courts to apply a presumption of reasonableness to a sentence within a properly calculated guidelines range, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."  Rita,

150

551 U.S. at 351, 127 S.Ct. at 2465. If a district court applies the guidelines as though they were mandatory or treats the range as presumptively reasonable, that is procedural error.

Hill argues that the district court "slavishly" adhered to the guidelines in arriving at his sentence. He claims that the judge has a pattern of sentencing defendants to a term of imprisonment within the advisory guidelines range. That a judge imposes sentences within the guidelines range in most cases is not a cause for concern. We suppose that can be said of many judges. Neither 18 U.S.C. § 3553 nor Booker establishes a quota of sentences outside the guidelines range.

Hill does not, and in view of the sentences imposed on some of his co-defendants cannot, assert that the district court judge in this case never varies from the guidelines range or only rarely does so. Of the eleven sentences he imposed as a result of this mortgage fraud scheme, three were outside the guidelines range — one was above it and two were below it.

Faced with that fact about the sentences imposed in this and the related case of Riley Graham[39] from late 2007 through early 2008, Hill cites comments of the district court judge from sentence proceedings in earlier, unrelated cases. First, in United States v. Battle, No. 04-CR-00076, at 51 (N.D. Ga. April 1, 2005)

---

[39]See supra, n.4.

(transcript of sentencing proceedings), the judge said to the defendant at the

sentencing hearing in April of 2005:

> Well, as I've said before, my reading of <u>Booker</u> is that the guidelines remain an important factor in deciding the sentence in a criminal case, and that a non-guideline sentence is only to be imposed in unusual circumstances where the structure of the guidelines or the sentencing range produced by the guidelines produces a fundamentally unfair result.

<u>Id.</u> Then, in May 2005, the same judge remarked at another sentencing hearing:

> Well as I've said many times by now, the guidelines bring a measure of consistency and fairness to sentencing, and it's just fundamentally unfair for a defendant to get a sentence of 151 months in my courtroom and then get a sentence of probation in the next courtroom, and the only way that consistency is going to be achieved in federal sentencing is to follow the guidelines, except in extraordinary cases where there's some fundamental unfairness inherent in the structure of the guidelines or in their application to a particular case.
>
> The one non-guideline sentence that I have imposed was a result of that where, because of a quirk in the way the case was indicted, two individuals who engaged in exactly the same conduct and who had exactly the same background, exactly the same criminal record, weren't treated the same; they were treated dramatically differently.

<u>United States v. House</u>, No. 02-CR-00745, at 112–13 (N.D. Ga. May 10, 2005)

(transcript of sentencing proceeding).

Finally, the district court made the following remarks at the sentencing of

another defendant in the <u>House</u> case, also in May 2005: "As I've said in other

cases, in order to impose a non-guideline sentence, I believe there must be some

152

fundamental unfairness approaching a miscarriage of justice . . . ." United States v. House, No. 02-CR-00745, at 27 (N.D. Ga. May 16, 2005) (transcript of sentencing proceeding). But the judge also stated in that case that following Booker he treated the guidelines as advisory, not mandatory. Id.

The statements from the three earlier cases are problematic. However, those statements were not made at sentencing in any of the cases before us in this appeal. They were made in April and May of 2005, only months after Booker was decided in January of that year, and a full two years before the Rita decision was issued. By the time that these defendants were sentenced two years later, the post-Booker sentencing law on this point had been clarified by the Rita decision.

The district court said nothing in this case indicating a lack of awareness of the Rita decision or suggesting that it was treating the guidelines as anything other than advisory. As Farmer points out, the court did invite the attorney for each defendant to address the issue of whether it should impose a sentence within the advisory guidelines range or outside the range, but there is nothing wrong with that. It is a question every sentencing judge faces in virtually every case, and asking the question actually indicates that the judge fully understands that the guidelines range is only advisory.

Laudermill points to a single statement the court made during her sentence hearing. The court said to her counsel: "Well, Mr. Rowsey, if I could give your client any more breaks than I already have within the guidelines and under the law, I would do it . . . . But I think I have given your client every break I can give her." We do not read that as anything more than an indication that the court felt it had calculated the guidelines correctly and had carefully considered all of the non-guidelines factors "under the law," that law being 18 U.S.C. § 3553. The court believed it had been as lenient with Laudermill as it could justify being.

For all of these reasons we are unpersuaded by the contention of Hill, Laudermill, and Farmer that the district court treated the guidelines in a manner that was inconsistent with the Booker and Rita decisions. The district court properly considered the § 3553(a) factors as well as the guidelines range, it varied upward or downward where it thought the circumstances justified doing so, and it gave well-reasoned explanations for each of its sentencing decisions.

## 2. Laudermill's Separate Contentions

Laudermill also contends that her sentence was procedurally unreasonable for three reasons specific to her. First, she argues that the district court erred by applying the 2001 version of the sentencing guidelines. According to Laudermill, the court should have applied the 2000 version of the guidelines because the last

154

conduct for which she was convicted occurred no later than August of 2001. That is not so. Laudermill was convicted of a conspiracy that extended well beyond the effective date of the 2001 edition of the guidelines. See U.S.S.G. §1B1.3(a)(1)(B). As the presentence report noted, even some of Laudermill's own conduct in furtherance of the conspiracy occurred after August 2001. The district court applied the correct version of the guidelines.

Second, Laudermill claims that her guidelines range was improperly calculated because the loss amount attributed to her should not have exceeded $200,000. We disagree. The district court properly applied a 20-level adjustment for a loss of more than $7,000,000 but less than $20,000,000 because Laudermill was accountable for a loss of $9,027,933 due to her involvement in the conspiracy. U.S.S.G. § 2B1.1(b)(1)(K) (2001); U.S.S.G. § 1B1.3.

Finally, Laudermill argues that the district court should not have applied an enhancement for money laundering under § 2S1.1 because she had no intent to conceal her share of the proceeds from the real estate closings. There was evidence that Laudermill intentionally concealed the source of her proceeds. The sentencing court could, and apparently did, find she was aware that payments to straw buyers and recruiters such as herself were concealed from the lenders through side deals between Hill and the straw buyers. Therefore, a two-level

155

enhancement was appropriate based on her conviction under 18 U.S.C. § 1956(a)(1)(B)(i). See U.S.S.G. § 2S1.1(b)(2)(B) (2001). Even if there were no evidence that Laudermill intended to conceal the money she made from the fraudulent transactions, the enhancement under § 2S1.1(b)(2)(B) would still have been appropriate because she was convicted under 18 U.S.C. § 1956(a)(1)(A)(ii) for money laundering with the intent to promote the illegal enterprise.

Laudermill has not convinced us that there was any procedural error in the imposition of her sentence.

## B. Substantive Reasonableness

Farmer, Laudermill, and Hill contend that their sentences are substantively unreasonable.

## 1. Farmer

Farmer argues that his 127-month sentence, which was near the low end of his guidelines range of 121 to 151 months, was substantively unreasonable because it was greater than necessary to comply with the goals of sentencing. The district court denied Farmer's request for a below-guidelines sentence after noting the presence of several aggravating factors, including: the magnitude of the fraudulent scheme; the costs borne by the government, the victim lenders, and the taxpayers; and Farmer's lack of remorse as well as his sophisticated background in

156

the mortgage industry. Despite those factors calling for a higher sentence, the court sentenced Farmer to just 6 months above the bottom of his guidelines range. It justified that leniency on the ground that Farmer had joined in some stipulations that helped move things along at trial and because the court thought the sentence was consistent with the § 3553(a) factors. Given all of the aggravating circumstances, it borders on the frivolous to argue that Farmer's sentence near the low end of the advisory guidelines was unreasonable.

## 2. Laudermill

Laudermill, who served the conspiracy by recruiting straw buyers, argues that her 87-month sentence, which was at the bottom of the 87 to 108 months guidelines range, was substantively unreasonable because: the straw buyers she recruited were equally or more blameworthy than she but were not prosecuted; her convictions were not within the "heartland" of money laundering cases; and the district court did not give enough weight to her limited involvement in the scheme.

The government's decision to prosecute Laudermill but none of those who were merely straw buyers does not render her sentence unreasonable. Whether the straw buyers were victims or uncharged co-conspirators is irrelevant to the reasonableness of Laudermill's sentence.

Laudermill's outside-the-heartland argument is that money laundering is usually associated with organized crime and drug trafficking, which is why the guidelines lead to such harsh sentences for the crime. She reasons that because she was not convicted of drug trafficking or organized crime — not in the usual, La Cosa Nostra sense, even though she was part of a well-organized criminal scheme — she ought to be given a special break at sentencing. Laudermill, though, was found guilty of money laundering under 18 U.S.C. § 1956, which plainly encompasses her conduct as part of Hill's mortgage fraud scheme, and she was sentenced accordingly. She got a heartland sentence for a heartland crime.

Laudermill's final argument is that the district court failed to adequately consider the nature and consequences of her offenses and her minor role in the conspiracy. The record of the sentencing proceeding does not support her argument. After acknowledging that the government was correct in arguing that Laudermill played an integral and active role in the mortgage fraud conspiracy, the district court went on to note that some leniency was in order because she had agreed to reasonable stipulations at trial and because, compared to other defendants, Laudermill deserved a smaller share of the blame. As the district court explained:

> [I]n perhaps the ordinary case and even in another mortgage fraud case we wouldn't characterize [Laudermill] as a minor participant. But

158

compared to Phillip Hill and compared to the professionals that were involved, the appraisers, the lawyers, the brokers, I think giving her a downward adjustment for minor role when her guideline offenses are driven not by what she profited in the scheme but by the total amounts of the loans and the money that were laundered, it seems to me the fair way to balance those two is to give her the minor role adjustment and depart downward on criminal history because of overrepresentation from Level Three to Level Two and give a sentence at the low end of the guideline range. That seems to me to be the fair thing to do under all the circumstances of this case.

Without the downward adjustments for playing a minor role and for an overrepresented criminal history, Laudermill's guidelines range would have been 121–151 months. Through those adjustments, however, the court reduced her guidelines range to 87–108 months, and then sentenced her to the very bottom of that lower range. Her sentence was not substantively unreasonable.

### 3. Hill

Hill argues that the district court's treatment of the guidelines as presumptively reasonable led it to impose a substantively unreasonable sentence that violates the "parsimony provision" of 18 U.S.C. § 3553(a), which directs courts to impose a sentence that is "'sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough v. United States, 552 U.S. 85, 101, 128 S.Ct. 558, 570 (2007); 18 U.S.C. § 3553(a). According to Hill, the court arrived at a sentence that was "unnecessarily harsh" by focusing on the range of

sentences recommended by the guidelines after calculating the myriad of enhancements that were applicable to his case.

We have recently recognized that what some call the "parsimony principle," expressed in § 3553(a), actually requires "that a sentencing court when handing down a sentence be stingy enough to avoid one that is too long, but also that it be generous enough to avoid one that is too short." United States v. Irey, 612 F.3d 1160, 1197 (2010) (en banc). This "Goldilocks principle," as it has also been called, directs the district court to impose a sentence that is "just right to serve the purposes of § 3553(a)." Id.

In its endeavor to arrive at a sentence that was just right for Hill, the district court noted that "[t]here are a number of aggravating factors that weigh in favor not only of a sentence within the guideline range but a sentence at the very top of the guideline range." The court observed that: (1) the amount of loss was not fully taken into account in calculating the guideline range; (2) mortgage fraud is a serious crime and the banks that lost the money are not the only victims of it; (3) mortgage fraud affects innocent individuals who live next to foreclosed properties; (4) many of the unwitting straw buyers had their credit ruined and were forced to declare bankruptcy; (5) Hill employed his co-defendants, many of whom had no criminal history, to assist him in his fraud, eventually subjecting them to long

160

prison sentences; (6) Hill had a history of fraud, as he had previously perpetrated a similar scheme in Carroll County before moving on to Atlanta; and (7) Hill continued his scheme long after he was aware that he was under investigation.

In spite of all those aggravating factors, the court still chose not to sentence Hill at or near the top of his guidelines range. It rewarded him with leniency for reducing the cost to the public of the trial by agreeing to reasonable and appropriate stipulations. Nevertheless, the court decided that it could not in good conscience sentence Hill to the shortest sentence recommended by the guidelines "given the aggravating circumstances and the enormity of the losses." The court then imposed a sentence of 336 months, which was closer to the bottom of the 324–405 months guidelines range than it was to the top. The court's balancing of the § 3553(a) factors and all of the circumstances falls well within the parameters of § 3553(a), and Hill's within-guidelines sentence is neither too harsh nor too lenient.

Finally, Hill argues that his sentence is unreasonable because it varies greatly from the sentences of his co-defendants and the sentences of other high-profile fraud defendants nationwide. First, Hill's co-defendants who received much more lenient sentences were not leaders in the conspiracy; he was the leader, the kingpin who orchestrated the whole thing. Without Hill there would have

been no conspiracy, no massive amount of mortgage fraud resulting from it, and no ruined lives in the wake of it. He bore the greatest responsibility for the massive crime and deserved the longest sentence. Although "the need to avoid unwarranted sentence disparities" is a factor to be considered in sentencing, see § 3553(a)(6), there is no unwarranted disparity between Hill's sentence and those of his co-defendants.

As for Hill's argument that there was an unwarranted disparity between his sentence and others who have been convicted of similar fraud crimes elsewhere in the nation, that would be difficult to gauge. And we are not convinced that a sentence imposed in this circuit is subject to a national grade curve. In any event, the Supreme Court has instructed us that the "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges. Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." Gall, 552 U.S. at 54, 128 S.Ct. at 599. The same is true here.

As we noted at the beginning of this opinion, Hill put in place and ran a massive conspiracy involving $110 million of fraudulent loans, almost all of which went into default causing more than $38 million in direct losses to lenders.

162

The people Hill used in his criminal scheme suffered greatly, and the economic pain he inflicted to satisfy his own greed was felt by countless homeowners in neighborhoods where the foreclosures that were a by-product of the scheme reduced property values. His sentence of 336 months is not substantively unreasonable.

## XII. Conclusion

We AFFIRM all of the convictions and sentences of all of the appellants in all respects, except that we VACATE the district court's order denying Rector's motion to dismiss, which asserted as its ground that the government had breached the proffer agreement; as to that motion, we remand Rector's case for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, and REMANDED.